UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                :
JAMES M. MESSINO,               :
                                :
        Petitioner,             :    Civ. No. 20-7443 (NLH)
                                :
    v.                          :    OPINION
                                :
NEW JERSEY STATE PRISON, et al.,:
                                :
        Respondents.            :
_____:

APPEARANCES:

Jill R. Cohen
210 Haddon Avenue
Westmont, NJ 08108

        *Counsel for Petitioner*

Christine A. Hoffman, Gloucester County Prosecutor
Dana R. Anton, Special Deputy Attorney General
Gloucester County Prosecutor's Office
P.O. Box 623
Woodbury, NJ 08096

        *Counsel for Respondents*

HILLMAN, District Judge

        Petitioner James M. Messino, a state prisoner at South
Woods State Prison in Bridgeton, New Jersey, petitions for a
writ of habeas corpus pursuant to 28 U.S.C. § 2254.  ECF No. 1.
He challenges his 2002 conviction for aggravated manslaughter
and endangering the welfare of a child on the grounds of
ineffective assistance of counsel and error by the post-
conviction relief ("PCR") judge.  ECF No. 1 at 9-27.  For the

reasons below, the petition will be denied and a certificate of appealability shall not issue.

I.    BACKGROUND

    A.    Factual Background[1] and Procedural History

    On direct appeal, the Superior Court of New Jersey, Appellate Division, summarized the evidence underlying Messino's conviction as follows:

> This matter arises from the death of D.R. on May 31, 1998.  D.R. was born on April 19, 1996.  His biological parents were Laurie Roberts and Mimi Mollo.  Roberts and Mollo ended their relationship before D.R. was born.  Roberts met defendant in October 1997.  They began dating and, in December 1997, they moved together with D.R. to an apartment in the basement of a home owned by Laurie's aunt, Elaine Roberts.
>
> From the time of his birth, D.R. suffered from an enlarged scrotum resulting from "hydrocele" or fluid around the testicles.  D.R. also suffered from a genetic disorder called Hunter's Syndrome, a form of mucopolysaccharidosis (MPS), which is a condition that affects the joints and bones and makes movement of the arms difficult.  On May 29, 1998, two days before his death, D.R. underwent surgery to reduce the size of his scrotum.  Dr. Michael Louis Nance, a pediatrician at Children's Hospital of Philadelphia [("CHOP")], performed the operation.  The doctor testified that at the time of the surgery, D.R.'s scrotum was slightly enlarged and bruised and the bruising extended to D.R.'s lower abdomen.  Nance stated that he observed blood in the tissues surrounding D.R.'s scrotum, which he had never seen when performing a hydrocele reduction procedure.  Nance said that D.R.'s platelet count was normal.  The child's blood clotting ability also was normal.  Nance stated that the incision made during the operation was not near D.R.'s mesentery, the fibrous tissue that holds the small bowel in place

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), this Court affords deference to the factual determinations of the State court.

2

and supplies blood to the bowel.  D.R. was discharged
from the hospital on May 30, 1998.

After D.R.'s release from the hospital, Roberts and
defendant left D.R. at the home of Jean Mangini,
Roberts' aunt.  Roberts and defendant went home and
went to sleep.  D.R. was brought home around 9:30 in
the evening.  Roberts testified that defendant put
D.R. to bed around 10:30 p.m.  While D.R. slept,
Roberts and defendant watched rented movies.

Around 5:30 a.m., the phone rang and D.R. was
awakened.  Roberts picked up D.R. to calm him and then
she handed the child to defendant, who said he would
put D.R. back to bed.  Roberts went upstairs to the
bathroom and, while she was in the bathroom, Roberts
heard D.R. cry out.  Roberts testified that she went
back downstairs and asked defendant why D.R. had cried
out.  Defendant said that D.R. did not want to go to
sleep.  Roberts and defendant went to bed, but shortly
thereafter Roberts heard D.R. making a gagging sound.
She went to the child and saw that his body was
"clenching and unclenching."  Roberts thought that
D.R. was having a seizure.  Roberts and defendant
called 911.

One of the paramedics who responded to the call
testified that when he arrived at the apartment, D.R.
was tossing, turning and crying.  The paramedic said
that D.R. looked pale and sickly.  The initial
physical check indicated that D.R. was in shock and he
appeared to be bleeding internally.  D.R.'s abdomen
was distended and, according to the paramedic, there
was a "very, very black and blue" bruise on the
child's right flank.  He stated that the bruise was
round, oval-like and about three to four inches in
diameter.  D.R.'s testicles were "purplish," like a
black color and "grossly swollen."

D.R. was taken to Kennedy Memorial Hospital.  Dr.
Frank J. DeMartino was the attending physician in the
emergency room.  He stated that, when he was brought
in, D.R. was in a "very grave clinical state."  He
also observed the swollen testicles and a fair amount
of bruising to the child's right flank.  DeMartino
asserted that D.R. was losing blood and the blood was
collecting in the child's testicles, the abdominal
area and the flanks.

3

Anita Brown, a registered nurse who attended to D.R. in the emergency room, testified that D.R. was "still and unresponsive" when he was first brought to the hospital.  She noticed that D.R. had a huge bruise on the lower right abdomen, that was larger than a grapefruit and round in shape.  Brown also noticed that D.R.'s scrotum was swollen and appeared to be filled with blood.  Brown approached defendant and she asked him what happened but defendant did not reply. Brown testified that defendant was "very pale and very quiet."  The medical personnel worked for an hour-and-a-half to resuscitate D.R.  Their efforts failed and D.R. died.

An autopsy was performed at [CHOP].  Dr. Paul Hoyer, the assistant medical examiner for Gloucester County, testified that the autopsy revealed that the surgical incision that had been made in the hydrocele procedure was open and gaping.  The autopsy also revealed that about a quart of blood had collected in D.R.'s abdominal cavity.  Hoyer observed a four-inch tear of the child's mesentery.  He testified that in his opinion the tear had been caused by a "large blunt force," such as from a forceful kick or punch, a car accident or a fall from ten or fifteen feet.  Hoyer also observed the bruise on D.R.'s abdomen and concluded that the child's death might be the result of child abuse and homicide.  He asserted that D.R.'s death was not a "metabolic death."  The cause of death was "hypovolemic shock."

Evidence also was presented at trial concerning injuries that D.R. had sustained in the months preceding his death.  On February 2, 1998, D.R. was brought to Dr. Jeffrey P. Kovacs, an orthopedic surgeon, because he was having problems with a cast placed by another doctor to treat a fracture in D.R.'s left tibia.  Kovacs examined D.R. and observed that the child's left upper thigh was "massively swollen." He found signs of a spiral fracture in D.R.'s left femur.  The femur fracture was about a week old.  The tibia fracture had been sustained about a month before the office visit.  Kovacs testified that Roberts' vague account of the injuries made him suspect that she was not telling him the full story.  Kovacs stated that it is uncommon to see two fractures in the same leg within a one-month period.  Such an occurrence, he

said, is "one of the hallmarks of child abuse."
Kovacs opined that D.R.'s fractures were not
"pathologic fractures" related to the child's MPS.

Dr. Paige Kaplan, head of the Biochemical Genetics
Unit at [CHOP], treated D.R. in February 1998.  She
also concluded that D.R.'s fractures were not causally
related to MPS.

Dr. Cindy Christian testified that she saw D.R. when
he was admitted to [CHOP] in February 1998.  She
consulted Kaplan who confirmed that there is no
association between MPS and bone fractures.  Christian
stated that she became convinced, to a reasonable
degree of medical certainty, that D.R. was a victim of
child abuse.  She asserted that, when D.R. was brought
to the hospital on May 31, 1998, his platelet count
was normal and he had no problem with blood clotting.
Christian stated that a clotting problem was not the
cause of the child's death.  She also stated that the
hemorrhaging in D.R.'s stomach was caused by the
tearing of the mesentery.  She asserted that such a
tear could not have been caused by dropping a child of
D.R.'s size ten inches onto a bed railing.

Dr. John Gregg is a pediatric orthopedic surgeon at
[CHOP].  He treated D.R. in February 1998 for the
multiple fractures.  Gregg testified that D.R. had
normal bone density and his bones were not especially
brittle.  The child also did not have a problem with
blood clotting.  Dr. Gregg testified that, based on
his observations, there was no doubt that D.R. had
been physically abused.

The police commenced an investigation shortly after
D.R.'s death.  Roberts and defendant both agreed to
accompany the investigating officers to the
prosecutor's office for interviews.  Defendant rode
with Detective Sergeant Richard O'Brien.  When he
arrived at the prosecutor's office, defendant was
taken to an interview room.  Defendant was given a
copy of the prosecutor's rights form and he was asked
to read it aloud.  Defendant did so and agreed to give
a statement.

O'Brien and Investigator Kenneth E. Crane interviewed
defendant and took a taped statement in which
defendant stated that when D.R. awoke on the morning

of May 31, 1998, Roberts attended to D.R. while he went outside to smoke a cigarette.  When defendant came back into the apartment, Roberts handed him the child and she went upstairs to the bathroom. Defendant said that D.R. was screaming because he did not want to part with his mother.  He said that when Roberts returned, D.R. quieted down.  After defendant went to bed, D.R. began making a heaving sound. Roberts thought D.R. was having a seizure and called 911.

During a break, Sergeant Alex Illas informed defendant that what he and Roberts told the police did not "add up."  Defendant said that he wanted to smoke a cigarette.  Illas accompanied defendant outside, where defendant asked Illas, "Do you think I need a lawyer?" Illas told defendant that it was his responsibility to tell defendant that he had a right to have a lawyer, but "that was his call."  Defendant said, "What is going to happen to me if I tell you what happened?" Defendant became tearful and told Illas that he had dropped D.R. and D.R. struck the side of the bed.

In a second taped interview, defendant said that when Roberts went up to the bathroom, he attempted to put D.R. on the bed by holding the child with both hands, one on each side of the abdomen.  According to defendant, D.R. squirmed in his hands, slipped from his right hand and fell.  Defendant said that the child fell about one or one-and-a-half feet. Defendant asserted that D.R. hit the bed railing against his upper chest.  Defendant said that he placed D.R. on his bed.  According to defendant, D.R. cried at first and then calmed down.  When Roberts returned, she and defendant went to sleep and shortly thereafter the child began to heave.  They called 911.

Defendant did not testify at trial.  He called two witnesses.  Dr. Roger A. Berg testified as an expert in the field of radiology.  He opined that the x-rays taken of D.R.'s tibia fracture indicated that it was a "toddler's fracture" which is common in children learning to walk.  Berg stated that the femur fracture could have been caused by a fall.

Dr. John E. Adams, a forensic pathologist, also testified.  He stated that D.R.'s abdominal injury was not consistent with a fist blow.  He asserted that

6

D.R. had some sort of blood clotting problem but he
did not know its cause.  He also stated that D.R.'s
abdominal bruise could have been the result of
striking the right flank against the rail of the bed
when he fell from defendant's hands.  Adams said that
the patterns in the bruise were not the sort of
patterns that could have resulted from a bare fist.

Adams also stated that that there were Hurley-Schleie
cell deposits in the child's mesentery.  The condition
made the mesentery tissue thicker and shorter and
therefore susceptible to injury from a lot less force
than would otherwise be required for a major injury.
Adams opined that, strictly speaking, the child had
not suffered from a mesentery tear but rather from a
rare bowel injury, where the bowel had been torn from
the mesentery.

State v. Messino, 378 N.J. Super. 559, 569-74 (App. Div. 2005)

(footnote omitted).

Messino was charged with first-degree murder and second-

degree endangering the welfare of a child.  Id. at 568.

Following a jury trial, he was convicted of first-degree

aggravated manslaughter (a lesser-included offense of murder)

and second-degree endangering the welfare of a child.  State v.

Messino, No. A-2888-16T4, 2019 WL 208098, at *1-2 (N.J. Super.

Ct. App. Div. Jan. 16, 2019).  He was sentenced to an aggregate

29 years of imprisonment -- 22 years on the manslaughter

conviction and 7 years on the endangering conviction -- subject

to the No Early Release Act, N.J.S.A. 2C:43-7.2(d)(2) and (20).

Id. at *2.  The Appellate Division affirmed on June 30, 2005,

Messino, 378 N.J. Super. 559, and certification was denied on

October 12, 2005, State v. Messino, 185 N.J. 297 (2005).

7

Messino filed a PCR petition in 2005.  State v. Messino, No. A-0535-08T4, 2010 WL 5288503, at *1 (N.J. Super. Ct. App. Div. Dec. 27, 2010).  He argued, among other things, that his counsel was ineffective for: (1) failing to interview and retain an MPS expert, as well as other experts, despite having been provided with the necessary funds to do so; (2) failing to properly investigate the results of an investigation by the Division of Youth and Family Services (DYFS)[2] into allegations of abuse; and (3) failing to present character witnesses.  Id. at *2.  The PCR court denied the petition without a hearing in 2008.  Id.  In 2010, the Appellate Division reversed and remanded for a hearing.  Id. at *1.

On remand, the PCR judge presided over an evidentiary hearing on 17 dates between December 2014 and June 2016,

> during which defendant testified and presented the
> testimony of more than twenty witnesses:  Dr. Phillip
> Ginsberg, a urology expert; Dr. Robert Stratton, a
> child abuse expert; Alexander Esposito, a private
> investigator and Dr. Claus Speth, a forensic
> consultant, who were retained by his trial counsel to
> assist in preparation of defendant's trial; a
> registered nurse and a nursing consultant who assisted
> DYFS in its evaluation of D.R.'s home prior to his
> death; and fourteen of the more than thirty witnesses
> defendant claimed in his PCR petition would have
> testified as character witnesses at trial.  Included
> among those witnesses were defendant's mother,

---

[2] DYFS is now known as the Division of Child Protection and Permanency.  Messino, 2019 WL 208098, at *3 n.3.

brother, aunt, co-workers, and friends.  Defendant's
trial counsel, Jaime Kaigh, testified on behalf of the
State over the course of five days.

Messino, 2019 WL 208098, at *3.

The Appellate Division summarized the evidence presented at

the hearing as follows:

Notably, Kaigh explained that after obtaining
defendant's file, he reviewed all discovery including
recorded statements, transcripts, diagrams, hospital
records, police reports, and lists of potential
witnesses.  Kaigh obtained voluminous out-of-state
medical records detailing D.R.'s medical history.
Kaigh summarized the defense theory of the case as
follows:

[D.R.] suffered from MPS.  There were
allegations of child abuse that had to be
addressed in conjunction with the allegation
of murder and homicide.  The child was
reported to have scratched corneas.  Cloudy
corneas are part of MPS.

The child was reported to have hair pulled
out, when in reality it was alopecia.  A
disease causing the hair loss.

. . .

The child was reported to have had multiple
leg fractures, yet, they can be explained as
toddler fractures.  The second fracture
coming when he was wearing a cast.

So, all the allegations of child abuse could
be explained medically, either through the
walking cast that he had, the toddler
fractures, the alopecia, the self-abusive
behavior of MPS.

So . . . my theory of the case was
consistent with [defendant's] last statement
to the police, he accidentally dropped this
child. . . . he was in no way a child

9

> abuser, all the abuse can be explained; and
> that not every accident is reckless.
>
> Certainly, the goal of this case was to get
> away from knowing or purposeful conduct . .
> . murder. So, when faced with a confession,
> that, [defendant] accidentally dropped the
> child, the only theory of this case . . .
> borne out through cross-examination of all
> the doctors, was that this was an accidental
> death. And, the main contributor was the
> MPS. Which also explained away many of the
> allegations of child abuse.

[(Emphasis added)].

From the inception of his representation, Kaigh
endeavored to find medical experts, hiring Esposito to
assist him.  They first hired Speth as a medical
consultant, who opined that D.R.'s death was related
to his MPS and "the bed that [D.R.] slept in could
have caused the injury if . . . defendant dropped the
child as he described in his second taped statement."
Because he had a criminal conviction, Speth did not
testify at trial.

Kaigh also hired Dr. John Smialek, a forensic
pathologist.  However, Dr. Smialek withdrew his
assistance because he disagreed with Speth's theory of
the case.  Dr. Smialek died sometime after withdrawing
from the case.

Thereafter, Kaigh attempted to retain Dr. Michael
Baden, whom Kaigh described as "probably the most
revered pathologist in the country."  However, Dr.
Baden was unable to author a report that was
beneficial to the defense because he believed
defendant dropped D.R. and that such conduct was
evidence of manslaughter or aggravated manslaughter.

After Dr. Baden withdrew from the defense team, Dr.
Adams, who had written a report on behalf of Roberts,
agreed with Speth's theory and agreed to author a
report supporting that viewpoint.  Apparently, Dr.
Adams's report was not furnished to the State until
just prior to trial.  Kaigh acknowledged that the
lateness of Adams's report and the previous report he
had authored on behalf of Roberts opining that D.R.'s

injuries were not caused by accidental means, likely
were not viewed favorably by the jury.  Nonetheless,
Kaigh thought Adams was a qualified forensic
pathologist, a good witness, and someone who could
convince a jury of his point of view.

Kaigh also addressed other aspects of his trial
strategy.  For example, he discussed his exhaustive
search to locate an expert in Hurler-Scheie Syndrome,
the specific type of MPS that afflicted D.R., and his
decision to refrain from pursuing additional test
results, which had been sent to Australia concerning
D.R.'s corneal injuries, concluding they were not
pertinent to the specific type of MPS at issue in the
case.  Further, Kaigh reviewed the DYFS records and
determined that they did not pertain to an
investigation of defendant, but rather to the
caretaking of D.R.  Kaigh also determined it was
unnecessary for Esposito to conduct interviews of the
State's witnesses.  Specifically, Roberts had informed
Kaigh "repeatedly that all of her family members
didn't like [defendant], and that [D.R.] . . . would
cry out when [defendant] came near [him]."

In discussing his reasons for refraining from calling
character witnesses, Kaigh emphasized that since
defendant previously lied to first responders and the
police, Kaigh believed it would be "extremely self-
defeating when a person has lied" to place before the
jury defendant's character for honesty through his
family and friends.  According to Kaigh, "[m]ost lay
people who make up [a] jury are going to say, [']a
mother would say anything for her child, whether it's
true or not[.']" During the evidentiary hearing,
defendant's proposed character witnesses gave
contradictory or non-responsive answers to the State's
question whether their opinion for truthfulness would
"change if [they] knew [d]efendant lied to the police
about what happened in this case[.]"

Among the other witnesses who testified at the
hearing, Dr. Ginsberg opined that he reviewed D.R.'s
hemoglobin tests, which indicated to him that the
child was bleeding before he arrived at the hospital
for his hydrocele surgery.  However, Dr. Ginsberg
acknowledged that the swelling to D.R.'s testicle
could have been caused by trauma.  He conceded that in

his twenty-five years of practice he had never treated
a patient with MPS.

<u>Messino</u>, 2019 WL 208098, at *3-5 (alterations in original).

The PCR judge denied the petition, finding Messino's claims
without merit.  <u>Id.</u> at *5.  On appeal, the Appellate Division
summarized the PCR judge's decision as follows:

> On June 24, 2016, Judge Becker issued a comprehensive
> written opinion concluding defendant's claims lacked
> merit.  Notably, the judge found "Kaigh to be credible
> in every respect during his testimony."  The judge
> elaborated:
>
>> The [c]ourt finds that [d]efendant's
>> assertion that trial counsel was
>> constitutionally ineffective for not calling
>> an expert witness specializing in MPS, as
>> well as other potential expert witnesses,
>> does not satisfy the <u>Strickland/Fritz</u>[3]
>> threshold.  The [c]ourt finds that trial
>> counsel, Mr. Kaigh, is credible and
>> exhausted all possibilities with respect to
>> researching, contacting, and pursuing all
>> potential expert witnesses for trial.  The
>> [c]ourt is satisfied that Mr. Kaigh's
>> conduct [was] illustrative of zealous
>> advocacy, not ineffective representation
>> that would entitle [d]efendant to relief.
>> This is especially true when considering
>> that matters of strategy are given a level
>> of deference.
>
> Judge Becker also found that trial counsel conducted a
> reasonable investigation into the allegations of child
> abuse. Similarly, he found Kaigh's decision not to
> present character witnesses to be a reasonable trial
> strategy intended to avoid highlighting defendant's
> initial lies.  Specifically:

---

[3] <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984)); <u>State
v. Fritz</u>, 105 N.J. 42, 58 (1987) (adopting the <u>Strickland</u> two-
part test in New Jersey).

12

> Defendant basically acknowledged that some
> form of mishap occurred which caused the
> child to have the resultant injuries.  This
> admission came after initial denials of the
> child having been subject[ed] to a mishap
> such as dropping, throwing or striking.  One
> can say that . . . [d]efendant accepted the
> victim with the conditions the child had on
> the day of the incident or mishap. . . .
> Defendant was not subsequently convicted of
> [p]urpose[ful] or [k]nowing [m]urder, but of
> a lesser[-]included offense of [a]ggravated
> [m]anslaughter, along with a separate charge
> of [e]ndangering the [w]elfare of a [c]hild.
> This verdict points to the fact that Mr.
> Kaigh's representation was in fact
> effective.  It could be reasonably concluded
> that the jury verdict was based upon . . .
> [d]efendant's actions with [a] child who was
> in a precarious situation health[-]wise and
> that the subsequent admission by . . .
> [d]efendant regarding the mishap was enough
> to constitute [aggravated m]anslaughter.  If
> . . . [d]efendant had acted to assist the
> child immediately, the result may have been
> different.

Finally, Judge Becker concluded defendant failed to
demonstrate a reasonable probability that trial
counsel's deficiencies prejudiced defendant.
Conversely, Kaigh was successful in his representation
of defendant because the jury found defendant guilty
of the lesser-included aggravated manslaughter charge,
rather than knowing or purposeful murder.

Messino, 2019 WL 208098, at *5.

The Appellate Division affirmed in January 2019

"substantially for the sound reasons expressed in [the PCR

judge's] post-hearing written decision."  Id. at *6.  The court

added the following comments:

> The judge discussed Kaigh's decision to refrain from
> presenting the testimony of Dr. Baden and defendant's

13

family members, friends and co-workers against the
backdrop of the case law which recognizes that the
decision as to which witnesses to call is "one of the
most difficult strategic decisions that any trial
attorney must confront." State v. Arthur, 184 N.J.
307, 320 (2005).  The decision is generally informed
by the testimony expected to be elicited, the
possibility of impeachment, both by prior
inconsistencies or conflicting testimony by other
witnesses, and the witness's general credibility.  Id.
at 320-21.  "Therefore, like other aspects of trial
representation, a defense attorney's decision
concerning which witnesses to call to the stand is 'an
art,' and a court's review of such a decision should
be 'highly deferential.'"  Ibid. (citation omitted).

In sum, the evidentiary hearing that defendant sought
and received provides no basis to set aside his
conviction and sentence. . . . We accept Judge
Becker's well-reasoned determination that defendant
failed to prove either prong of the Strickland
standard.  We therefore see no reason to disturb the
judge's factual and credibility findings.  Those
findings are fully supported by the record and are
entitled to our deference.  State v. Robinson, 200
N.J. 1, 15 (2009).

To the extent we have not addressed defendant's
remaining claims, we conclude they lack sufficient
merit to warrant discussion in a written
opinion. R. 2:11-3(e)(2).

Messino, 2019 WL 208098, at *5.  Certification was denied in

June 2019.   State v. Messino, 238 N.J. 468, 212 A.3d 441

(2019).

    B.   The Habeas Petition

    Messino filed his § 2254 petition in June 2020, ECF No. 1,

arguing that he is entitled to habeas relief on the following

grounds: (1) counsel was ineffective on the basis of his

cumulative errors (ECF No. 1 at 9-12 (Ground One)); (2) the PCR

14

court ignored Dr. Speth's medical testimony (id. at 12–15
(Ground Two)); (3) counsel and the trial court failed to "mold
the jury verdict" in violation of Apprendi[4] (id. at 15–16 (Ground
Three)); (4) counsel was ineffective for hiring Dr. Adams two
weeks before trial and for hiring him when he had previously
authored a report stating that the fatal injury could have been
caused by abuse (id. at 16–17 (Ground Four); (5) counsel was
ineffective for ignoring the character witnesses who would have
testified as to Messino's exemplary character (id. at 18–19
(Ground Five)); (6) counsel was unethical in failing to disclose
to Messino (a) that he was discussing with his partners leaving
the firm, (b) that he had left the firm prior to sentencing, and
(c) his reason for leaving the firm (id. at 19 (Ground Six); (7)
counsel was ineffective for failing to consult with doctors in
Australia who had diagnosed D.R. with a severe form of MPS (id.
at 19–20 (Ground Seven)); (8) the PCR judge erred by "adopt[ing]
the bald, self-serving assertions of trial counsel and
ignor[ing] [Messino's] evidence in the evidentiary hearing" (id.
at 21–22 (Ground Eight)); (9) counsel's closing arguments
"demonstrated his lack of any credible or cohesive defense
theory for the case" (id. at 22–23 (Ground Nine)); (10) counsel
was ineffective for failing to request a charge on the lesser

---

[4] Apprendi v. New Jersey, 530 U.S. 466 (2000).

included third-degree endangering the welfare of a child or ask the jury to decide the lesser included offense on the verdict sheet (id. at 24-25 (Ground Ten)); (11) counsel was ineffective for failing to call Messino (id. at 25-26 (Ground Eleven)); and (12) counsel was ineffective for failing to object to testimony regarding child abuse by witnesses who were not qualified to opine on child abuse (id. at 26-27 (Ground Twelve)).  Petitioner concedes that Grounds Three (id. at 16), Six (id. at 19), Nine (id. at 23), Ten (id. at 24-25), Eleven (id. at 26), and Twelve (id. at 27) are unexhausted.

The State answered in September 2020.[5]  ECF No. 7.  In November and December 2020, petitioner replied.  ECF Nos. 11 (brief), 12 (exhibits).  The matter is therefore fully submitted and ready for decision.

## II.  LEGAL STANDARD

### A.  Standard of Review

The district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A habeas

---

[5] The State failed to respond to Grounds Eleven and Twelve.  ECF No. 7 at 12-24 (State's answer addressing Grounds One through Ten).

petitioner must establish entitlement to relief for each claim in his petition based upon the record that was before the state court.  See Eley v. Erickson, 712 F.3d 837, 846 (3d Cir. 2013); Parker v. Matthews, 567 U.S. 37, 40-41 (2012).  District courts must be "highly deferential" to the determinations of state trial and appellate courts.  See Renico v. Lett, 559 U.S. 766, 773 (2010).

If the state courts have adjudicated a claim on the merits, the district court shall not grant a writ of habeas corpus unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  Federal law is "clearly established" for these purposes if it is clearly expressed in "the holdings, as opposed to the dicta" of the United States Supreme Court.  Woods v. Donald, 575 U.S. 312, 316 (2015) (internal quotation marks and citation omitted).  "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong."  Id.  If a petitioner challenges an

17

allegedly erroneous state court factual determination, that determination "shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

The relevant state court decision for federal habeas corpus review is the last reasoned state court decision.  See Bond v. Beard, 539 F.3d 256, 289-90 (3d Cir. 2008).  These standards apply "even where there has been a summary denial" by the state court.  Cullen v. Pinholster, 563 U.S. 170, 187 (2011).

B.   Exhaustion

A federal court may not grant a writ under § 2254 unless the petitioner has first "exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A); see also Rose v. Lundy, 455 U.S. 509, 515 (1982); Henderson v. Frank, 155 F.3d 159, 164 (3d Cir. 1998); Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997).  The petitioner must afford the state courts "the opportunity to resolve the federal constitutional issues before he goes to the federal court for habeas relief." Id. (quoting Zicarelli v. Gray, 543 F.2d 466, 472 (3d Cir. 1976)).  Exhaustion also permits development of a complete factual record in state court, which aids federal court review. See Lundy, 455 U.S. at 519.

18

To exhaust, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." Leyva v. Williams, 504 F.3d 357, 365 (3d Cir. 2007) (citing Stevens v. Delaware Corr. Ctr., 295 F.3d 361, 369 (3d Cir. 2002)). "Fair presentation means that a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." Rainey v. Varner, 603 F.3d 189, 198 (3d Cir. 2010) (citations and internal quotation marks omitted). "[T]he claims heard by the state courts must be the 'substantial equivalent' of claims asserted in the federal habeas petition. Reliance on the same constitutional provision is not sufficient; the legal theory and factual basis must also be the same." Massey v. Warren, No. CV 13-3439, 2018 WL 6649723, at *3-5 (D.N.J. Dec. 19, 2018) (citing Picard v. Connor, 404 U.S. 270 275, 277 (1971)); see also McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999) ("It is not sufficient that a 'somewhat similar state-law claim was made.'") (quoting Anderson v. Harless, 459 U.S. 4, 6 (1982)).

"The exhaustion doctrine therefore requires a petitioner challenging a New Jersey conviction under § 2254 to have fairly presented each federal ground that is raised in the petition to all three levels of the New Jersey courts — that is, the Law Division, the Appellate Division, and the New Jersey Supreme

19

Court." _Prall v. Att'y Gen. of the State of N.J._, No. 3:18-CV-2614, 2021 WL 733685, at *5 (D.N.J. Feb. 25, 2021) (citing _O'Sullivan v. Boerckel_, 526 U.S. 838 (1999); _Lundy_, 455 U.S. at 509). "The burden is on the habeas petitioner to prove exhaustion." _DeFoy v. McCullough_, 393 F.3d 439, 442 (3d Cir. 2005).

Generally, district courts should dismiss petitions containing unexhausted claims in the absence of a state court decision clearly precluding further relief, even if it is not likely that a state court would consider the claims on the merits. _See Lundy_, 455 U.S. at 522; _Banks v. Horn_, 126 F.3d 206, 212-14 (3d Cir. 1997); _see also Toulson v. Beyer_, 987 F.2d 984, 989 (3d Cir. 1993) ("Because no [New Jersey] court has concluded that petitioner is procedurally barred from raising his unexhausted claims and state law does not clearly require a finding of default, we hold that the district court should have dismissed the petition without prejudice for failure to exhaust state remedies.").

C.   Procedural Default

"The procedural default doctrine is an important corollary to the exhaustion requirement." _Fowlkes v. Att'y Gen. of N.J._, No. CV 21-7734, 2021 WL 4129489, at *2-3 (D.N.J. Sept. 10, 2021); _see also Davila v. Davis_, 137 S. Ct. 2058, 2064 (2017). This doctrine "applies to bar federal habeas when a state court

declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  The procedural default doctrine also applies to bar federal habeas claims when a prisoner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."  Id. at 735 n.1; Caswell v. Ryan, 953 F.2d 853, 861 (3d Cir. 1992); see O'Sullivan, 526 U.S. at 838 (failure to invoke one complete round of a state's established appellate review process resulted in a procedural default).  To overcome a procedural default of federal claims in state court, a prisoner must demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750.

D.   Merits Review

When a petitioner's constitutional claims are unexhausted or procedurally defaulted, a court can nevertheless deny them on the merits.  See Carrascosa v. McGuire, 520 F.3d 249, 254-55 (3d Cir. 2008) ("Section 2254(b)(2) provides that '[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the

remedies available in the courts of the State.'") (quoting 28 U.S.C. § 2254(b)(2)); Taylor v. Horn, 504 F.3d 416, 427 (3d Cir. 2007) ("[B]ecause we will deny all . . . claims on the merits, we need not address exhaustion."); Bronshtein v. Horn, 404 F.3d 700, 728 (3d Cir. 2005) ("[W]e may reject claims on the merits even though they were not properly exhausted, and we take that approach here.").

Where the state courts have not "reached the merits of a claim thereafter presented to a federal habeas court," however, the federal court must "conduct a de novo review over pure legal questions and mixed questions of law and facts . . . ." Taylor v. Horn, 504 F.3d 416, 429 (3d Cir. 2007). Even on de novo review, the state court's factual determinations are presumed to be correct, unless the petitioner rebuts that presumption by clear and convincing evidence. Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) (citing 28 U.S.C. § 2254(e)(1)).

III.  DISCUSSION[6]

A.  Applicable Law

The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI; see Strickland v. Washington, 466 U.S. 668, 686

---

[6] The Court has reordered Messino's grounds for relief in an effort to address them in chronological order -- from pretrial investigation to sentencing to alleged errors by the PCR court.

(1984).  A claim of ineffective assistance has two necessary components.  Id. at 687.  First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness," id. at 687–88, meaning he "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  Id. at 690. Second, a petitioner must establish prejudice, i.e., a reasonable probability that the result of the trial would have been different absent the deficient act or omission.  Id. at 687.  Further, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  Strickland, 466 U.S. at 697.

On habeas review, it is not enough that a federal judge would have found counsel ineffective.  Rather, the judge must find that the state court's resolution of the issue was unreasonable, a higher standard.  Harrington v. Richter, 562 U.S. 86, 101 (2011).  "And while judges may be tempted to second guess defense counsel's decisions, we must keep in mind that 'advocacy is an art and not a science, and . . . strategic choices must be respected in these circumstances if they are based on professional judgment.'"  Gaines v. Superintendent Benner Twp. SCI, 33 F.4th 705, 712 (3d Cir. 2022) (quoting Strickland, 466 U.S. at 681).  In other words, "counsel's

23

strategic choices will not be second-guessed by *post-hoc*
determinations that a different trial strategy would have fared
better." Rolan v. Vaughn, 445 F.3d 671, 681–82 (3d Cir. 2006).

B. Analysis

At the outset, the Court notes that Messino is represented
in this proceeding by the same counsel who represented him at
the PCR hearing. In his reply brief, Messino asserts that he
"will rely on the allegations in the petition, exhibits thereto,
the transcripts of the trial, transcripts of the evidentiary
hearing in the petition for post-conviction relief and the
attached brief." ECF No. 11 at 1–2 (emphasis added). He
"requests that this Court review the records presented,
including the notes of testimony at trial and the transcripts of
the evidentiary hearing in the trial court . . . ." Id. at 2
(emphasis added). Also in his reply brief, he lists 16 trial
transcripts, but advises that they are "not attached." Id. at
3, n.3. If Messino's intent was for the Court to review the
trial transcripts, he was required pursuant to 28 U.S.C.A. §
2254(f) to provide them or to seek an order directing the State
to provide them.[7]

---

[7] 28 U.S.C.A. § 2254 (f) provides, in pertinent part:

    If the applicant challenges the sufficiency of the
    evidence adduced in such State court proceeding to
    support the State court's determination of a factual
    issue made therein, the applicant, if able, shall
    produce that part of the record pertinent to a

24

Messino did not provide the trial transcripts, nor seek an order requiring the State to provide them, and he does not cite the trial transcripts in his petition or his reply;

---

determination of the sufficiency of the evidence to support such determination.  If the applicant, because of indigency or other reason is unable to produce such part of the record, then the State shall produce such part of the record and the Federal court shall direct the State to do so by order directed to an appropriate State official.

Id., see also, e.g., Sergent v. Douma, No. 12-810, 2016 WL 323681, at *13 (W.D. Wis. Jan. 26, 2016) ("If a petitioner challenges the sufficiency of the evidentiary record adduced in the state court proceedings, then § 2254(f) puts the burden on the petitioner to produce that part of the state court record pertinent to a determination of the sufficiency of the evidence to support the challenged determination."); Martin v. Hatch, No. 10-746, 2011 WL 13279028, at *2 (D.N.M. Oct. 18, 2011) ("When a petitioner challenges the sufficiency of the evidence, generally the petitioner has the burden of producing the state court record or asking the Court to order the state to produce it.") (citing § 2254(f)), report and recommendation adopted, 2011 WL 13279029 (D.N.M. Dec. 2, 2011); Colvin v. Medina, No. 10-00896, 2011 WL 4502028, at *1 (D. Colo. Sept. 29, 2011) ("In denying Mr. Colvin's Petition, this Court found that Mr. Colvin had not come forward with the record from the Rule 35 hearing that would corroborate his representations as to the content of Mr. Bell's counsel's testimony, and thus, his contention that the trial court's factual finding was erroneous.  This Court noted that 28 U.S.C. § 2254(f) places the burden on a habeas petitioner challenging a state court's factual finding to 'produce that part of the record pertinent to a determination' of the disputed factual issue, and that the burden only shifts to the respondent to produce the record upon a showing by the petitioner that he was unable to produce the record.  The Court found that Mr. Colvin was not proceeding in forma pauperis on his petition, and had not otherwise shown that he could not produce the transcript from the evidentiary hearing on the Rule 35 proceeding, and thus, the Court found that Mr. Colvin had failed to support his contention that the trial court erred in its assessment of Mr. Bell's counsel's testimony.").

25

instead, he appears to rely on the PCR hearing transcripts, which are before the Court and which the Court has carefully reviewed.  Even if, however, Messino had filed the 16 trial transcripts along with his petition or reply brief, the Court would not have been obligated "to rummage through a ponderous trial transcript in search of an excuse for a defense counsel's lapse." Lee v. Kemna, 534 U.S. 362, 385 n.15 (2002).  Rather, it is Messino's obligation to direct the Court's attention to the portions of the transcripts that support his arguments. See, e.g., United States ex rel. Green v. Greer, 667 F.2d 585, 586 (7th Cir. 1981) (an examination of a record is not required if the petitioner fails to identify any incompleteness or inaccuracies in the facts before the district court); Thomas v. Sims, 80 F. App'x 475, 480-81 (7th Cir. 2003) (transcripts were "not necessary to assess the reasonableness of the state appellate court's decision," because court was "confident that if the transcript contained any information helpful to his client's cause, [counsel] would have brought it to our attention.").  Messino has not done that here, since his petition does not cite the trial transcripts.

Accordingly, given that: (1) it was Messino's burden to supply the Court with the record support for his asserted grounds for relief; (2) Messino has acknowledged in his counseled brief that the trial transcripts have not been

26

provided; and (3) Messino does not cite the trial transcripts in
support of his grounds for relief, the Court will address
Messino's claims without the benefit of those transcripts.

> 1. Hiring Dr. Adams, Ignoring Dr. Speth's Testimony
>    at the PCR Hearing, and Failing to Consult with
>    Doctors in Australia (Grounds Two, Four, and
>    Seven)

Messino argues that counsel was ineffective for (a) hiring
Dr. Adams two weeks before trial and (b) hiring him despite him
previously having written a report stating that the fatal injury
could have been caused by abuse.  ECF No. 1 at 16-17; ECF No. 11
at 27-28.  The State responds that counsel must deal with the
facts presented by the case, and that despite his best efforts,
Kaigh had a difficult time procuring an expert to support his
defense.  ECF No. 7 at 16.  Under these circumstances, the State
argues, making "every effort to procure an expert willing to
issue an opinion on a very rare disease," and finding one "at
the last minute who unfortunately did not testify as defendant
wished" does not equate to ineffective assistance of counsel.
ECF No. 7 at 16.

Messino also asserts that the PCR judge "completely
ignored" Dr. Speth's medical testimony.  ECF No. 1 at 12-15.
The State responds that Dr. Speth could not testify at trial
because he had surrendered his medical license after a criminal

27

conviction, and Messino is using this claim "to get a second shot with his first choice of experts."  ECF No. 7 at 14.

Messino further argues that counsel was ineffective for failing to consult with doctors in Australia who had diagnosed D.R. with the severe form of MPS.  ECF No. 1 at 19–20; ECF No. 11 at 23–25.  Messino asserts that counsel should have followed up on a report in D.R.'s CHOP records that was available at the time of trial.  Id. at 20.  The report was from an Australian lab where tissue samples had been sent for testing, and it indicated that further testing may determine whether D.R. suffered from a mild or severe form of MPS.  Id.  In preparation for the PCR hearing, samples were sent to Australia and further testing was conducted.  Id.  Messino argues that the results confirmed, "scientifically, that the child suffered from the more severe form of MPS-1."  Id.

The State responds that trial counsel was not ineffective for failing to consult with the Australian doctors because: (1) the follow-up test results did not exist at the time of trial; (2) even if the results had existed, the additional testing did not return a definitive diagnosis, rather the lab report stated only that the results "may be consistent with" the more severe form; and (3) there was testimony that no form of the disease would have caused the fatal injuries.  ECF No. 7 at 20–21.

28

The PCR court reviewed the hearing testimony related to trial counsel's efforts to secure expert witnesses as follows:

i)   Forensic Pathologist - Dr. John Smialek

On direct examination, trial counsel Jaime Kaigh indicated that the defense theory of the case was that the death of [D.R.] was the result of MPS.  This was a theory developed and promulgated by Dr. Klaus Peter Speth, M. D., a former medical examiner, who Mr. Kaigh retained as a consultant in this case.  However, for reasons to be discussed below, Dr. Speth at all relevant times in this case did not have a medical license and was unable to testify at trial.  He therefore, assumed a strictly consulting role in preparing for trial.

Consequently, Attorney Kaigh attempted to find a forensic pathology expert who would adopt Dr. Speth's theory of the case, and could properly testify at trial.  He contacted and met with Dr. John Smialek, a certified forensic pathologist.  Regarding his interactions with Dr. Smialek, Mr. Kaigh testified as follows:

> Prosecutor:  Did you have any conversations or dealings with Dr. Smialek regarding the evidence or regarding any opinion he might have?
>
> Jaime Kaigh:  Yes. I recall sitting down with Dr. Smialek and talking about the facts of this case, of what help he could be Smialek, my recollection is, is one of the few pathologists like Speth that's certified anatomic, clinical, and pathologic.  So, he had all three certifications, he seemed like a good person for this job despite the sort of fractured feelings we may have had toward one another, because of the brutal cross we'd had in Burlington County, he seemed eager to help . . ." (T: 2/20/2015, 13:24 - 14:10).

However, Mr. Kaigh testified that he subsequently learned that Dr. Smialek was fatally ill and would die soon thereafter.  Thus, Dr. Smialek was unable to

testify because of his death.   [T:2/20/2015, 14:3-9).
Further, Dr. Speth was unable to testify, as evidenced
by the following colloquy:

> Judge Becker:  And then, you said you sat
> down with [Smialek] and went over the case,
> and said you were trying to get him to adopt
> a particular theory?
>
> Jaime Kaigh:  Yes, Speth had advanced
> certain theories about the case that hadn't
> been heard before because Speth was
> unavailable as a witness, I was searching
> for a medical examiner who would put forth
> his theory.
>
> Judge Becker:  And, why wasn't Speth
> available?
>
> Jaime Kaigh:  Because he [Speth] had
> suffered a criminal conviction. (T:
> 2/20/2015, 16:4 - 16:14).

Dr. Speth testified that he had voluntarily given up
his medical license. As Attorney Kaigh testified, he
was unable to call Dr. Speth, and was faced with the
challenge of finding a medical expert who would adopt
a theory that revolved around an extremely rare
genetic disorder. Nevertheless, Mr. Kaigh continued to
pursue other potential expert witnesses.  The Court
notes that it is apparent that the theories of Dr.
Speth have continued to evolve up to and through the
submission of his initial report in support of this
PCR.

ii)  Forensic Pathologist - Dr. Baden

One of Defendant's main assertions is that the Messino
family was informed that trial counsel would retain
Dr. Michael Baden as an expert in forensic pathology,
and that funds were provided for this purpose, but he
was not retained.  This topic was explored by the
prosecutor on the cross examination of Attorney Kaigh.

> Prosecutor:  Going back to hiring of
> experts.  After Dr. Smialek basically said
> he was unavailable, returned the retainer,

and could not testify, did you then attempt
to hire another expert?

Jaime Kaigh:  Yes.

Prosecutor:  And can you tell the court how
that occurred and what happened?

Jaime Kaigh:  Alex [Esposito] and I had
worked together on many cases through the
years, including some larger pieces of
litigations, so that we were friends,
besides having a professional relationship
of investigator and attorney.  And, Alex
told me that he had a way to communicate
with Dr. Baden, who, at the time, was
probably the most revered pathologist in the
country.  And, I had Alex contact Dr. Baden
in reference to this case. (T: 2/20/2015,
22:13 - 23:21).

Attorney Kaigh told the Court how he spoke with Dr.
Baden in reference to this case, over a conference
call with investigator Alex Esposito, as well as
through an individual call.  Kaigh also reported that
throughout trial preparations, he was anticipating a
report from Dr. Baden.  The prosecutor questioned:

Prosecutor:  During your preparation for
trial, did you anticipate getting a report
from Dr. Baden?

Jaime Kaigh:  Yes.

Prosecutor:  Did you ever get a report from
Dr. Baden?

Jaime Kaigh:  I did not.

Prosecutor:  And, do you recall why that
never occurred?

Jaime Kaigh:  I never talked with Baden
about that issue; but, Alex relayed to me
that Dr. Baden said he could not write a
report that would be beneficial to us.  (T:
2/20/2015, 23:13 - 23:21).

31

Intuitively, it is not good trial strategy to call an
expert witness whose opinion is not favorable to the
Defendant.  Given the fact that Attorney Kaigh worked
closely with Investigator Alex Esposito on this case
to flesh out all possible defense theories, the Court
finds that logical and sound strategy existed for
Attorney Kaigh not to call Dr. Baden after receiving
this information.  This Court found Attorney Kaigh to
be credible in every respect during his testimony.

iii) MPS Specialist

Finally, central to Defendant's argument is the
allegation that trial counsel was constitutionally
ineffective for failing to retain an expert in the
field of MPS, a condition from which [D.R.] was
suspected to suffer.  In light of the record, it does
not appear that either party disputes the fact that
the entire spectrum of MPS encompasses extremely rare
conditions.  On direct examination, Defense's own
expert, Dr. Robert Stratton, M. D., admitted that he
had only treated one child with MPS in his
approximately twenty years of practicing medicine. (T:
12/17/2014, 89:21-24).

On direct examination, Attorney Kaigh proffered the
reasons he failed to retain an expert in the field of
MPS:

> Jaime Kaigh:  I attempted throughout this
> process to get, besides looking for a
> qualified forensic pathologist, I was also
> looking for an expert in the Hurler-Scheie
> syndrome.  I did exhaustive search on what
> there was on the internet at that time.  I
> had paralegals available to me at
> Hockfield's firm, two of which I recall
> helping me to look.  I went to a medical law
> library in Philadelphia in an attempt to
> find information that might not be available
> on the internet, I consulted with Dr. Edward
> Fleishman, as a favor to me.  A doctor of 30
> years who was a general practitioner.
> Looking for, not information for Hurler-
> Scheie, but who might be an expert in this
> area.  Eventually my client's co-defendant
> was removed from this case.  Knowing that
> Dr. Adams had written a report for her, and

32

was intimately familiar with the details, I
contacted Dr. Adams, presented Speth's
theory to him, and Adams was willing to
write an addendum, an additional report,
supporting Speth's point of view.

. . .

Prosecutor:  And would it be fair to say his
report came weeks before the trial started?

Jaime Kaigh:  My recollection is it came
about six weeks before the trial started,
maybe closer. And, I believe, in retrospect,
that the date of that report, being
presented to this jury was not a strong
thing for us.  In other words, I think it
hurt us in the eyes of the jury.  Of course,
the jury acquitted of murder, but
nonetheless, my recollection is that Mr.
Gangloff, the prosecutor, emphasized that.
That this report was recently written and
that Adams had, in fact, written a different
report in the past for a different
defendant.

Prosecutor:  Okay. Is it fair to say that at
least as early on in 1999, there were
attempts by you or someone on your behalf to
find an expert?

Jaime Kaigh:  Yes. (T:2/20/2015, 24:1 -
25:22).

Further, on cross examination, Defendant's attorney,
Jill Cohen, asked the following questions:

Jill Cohen:  Okay. So, [Baden] was on board,
and you understood that he needed an MPS
specialist in order to give an opinion
right?

Jaime Kaigh:  I think 1 asked Speth to find
an MPS specialist, and he couldn't.

Jill Cohen:  Okay. You said you went to the
library and you personally tried to get an
MPS expert.

33

Jaime Kaigh:  I did.

Jill Cohen:  Okay. And, you're telling me that in this country you couldn't find an MPS expert?

Jaime Kaigh:  I don't think it was an MPS expert.  I think that's the lack of a sharper definition.  What we needed was an expert in Hurler-Scheie, which is a very -- kind of a narrow field.  There was no such person available.  And, I can't help but tell you that I don't see an expert report today about it.

Jill Cohen:  Okay.  But, the question is, did you make efforts to get one, that's the question?

Jaime Kaigh:  Absolutely.  Absolutely, I made efforts.  I consulted with Speth.  I had paralegals trying to find it.  I looked myself, as I mentioned earlier.  I went to a medical library.  I looked through my own -- my father having been a physician, had a medical library; I looked through that. I went on the internet, as it was, back in 2002, or 1999 in the time frame that we're talking about.  And, funny as it seems, in retrospect, Speth seemed to be the best reference there was.

Jill Cohen:  What do you mean the best reference; I don't understand what you mean?

Jaime Kaigh:  I think that Speth's analysis, that it was protein being stored there, and not healing mesentery.  That was the first time anyone gave that opinion.  And, to me, it was remarkable that Dr. Adams would effectively change his opinion and agree to that.  (T:2/20/2015, 47:11 - 48:19).

ECF No. 1-2 at 16-22.

The PCR court found that trial counsel was "credible and exhausted all possibilities with respect to researching,

contacting, and pursuing all potential expert witnesses for
trial." Id. at 22-23. The court was "satisfied that Mr.
Kaigh's conduct is illustrative of zealous advocacy, not
ineffective representation that would entitle Defendant to
relief," which "is especially true when considering that matters
of strategy are given a level of deference." Id. at 23.

The PCR court then reviewed Dr. Speth's testimony at the
PCR hearing and the relevance of a determination regarding the
exact form of MPS from which D.R. suffered:

> The Court is mindful that during the Defendant's
> presentation of various witnesses, including Mr.
> Esposito and Dr. Speth, that a new, if not somewhat
> related, theory of the child's condition was put forth
> by the Defendant. Dr. Speth put forth a theory that
> the child had MPSI with Hydrocele (IgG4), which would
> cause liver and spleen enlargement and ongoing
> Sclerosing Messenteritis. This should not be confused
> with Hunter's Syndrome which is another form of MPS
> discussed during Dr. Speth's testimony. The theory
> posited was that this new IgG4 condition, if the child
> victim did have that condition, with the resultant
> tenderness due to a recent operation to reduce the
> size of the scrotum, would have made the child mere
> susceptible to serious injury from someone throwing,
> dropping or striking the child. The Defendant
> basically acknowledged that some form of mishap
> occurred which caused the child to have the resultant
> injuries. This admission came after initial denials
> of the child having been subject to a mishap such as
> dropping, throwing or striking. One can say that the
> Defendant accepted the victim with the conditions the
> child had on the day of the incident or mishap. The
> Defendant was not subsequently convicted of Purpose or
> Knowing Murder, but of a lesser included offense of
> Aggravated Manslaughter, along with a separate charge
> of Endangering the Welfare of a Child. This verdict
> points to the fact that Mr. Kaigh's representation was
> in fact effective. It could be reasonably concluded

35

that the jury verdict was based upon the Defendant's
actions with child who was in a precarious situation
health wise and that the subsequent admission by the
Defendant regarding the mishap was enough to
constitute Negligent Manslaughter.  If the Defendant
had acted to assist the child immediately, the result
may have been different.

Dr. Speth acknowledges that there was no readily
available expert in the area of MSP, MSPI (Hurler-
Scheie), or MPSI with Hydrocele (TgG4).  Therefore,
Jamie Kaigh acted in a professionally acceptable
manner in preparation and presentation of this case.
The Court finds that a reasonable jury, viewing the
same evidence and reports as submitted by Dr. Speth,
could have still found the Defendant guilty of
Aggravated Manslaughter based upon the Defendant's
subsequent admissions which were a change from the
initial report given by the Defendant at the time of
the child being in distress.  There was unrefuted
testimony that when the Defendant put the child to bed
on that fateful evening, the child's mother heard the
child cry out and the Defendant denied any mishap or
issue with the child other than that the child did not
want to go to bed.  He later admitted that the child
was "dropped" and hit the bar on the crib.  Shortly
thereafter, the child went into a seizure.  The
bruising on the child's abdomen and the large amount
of blood in the swollen scrotum confirmed this
"mishap."  The autopsy revealed that the surgical
incision from the operation on the Hydrocele was
opened and gaping.  In reality, the exact diagnosis of
any form of MPSI would not have changed this fact.

ECF No. 1-2 at 23-24.

The PCR court found "by a clear and convincing standard

that the [Messino did not show] that Mr. Kaigh's performance

failed to meet the objective standard of reasonableness."  Id.

at 25.  The court explained:

Mr. Kaigh's performance leading up to and during the
trial was reasonable and competent.  Therefore, the
Court cannot find that Mr. Kaigh's actions in regards

36

to the representation of Mr. Messina fell outside the wide range of professional competent assistance when considered in light of all the circumstances of the case. An attorney's performance is measured by reasonableness under prevailing professional norms in consideration of the totality of the circumstances. Mr. Kaigh's actions in preparation for this case comports with sound trial strategy based upon the record. Mr. Kaigh's overall performance as demonstrated by this record indicates capable advocacy on behalf of Mr. Messino. Based upon these findings the Court finds that the first prong of the <u>Strickland</u> Test has not been met by the defendant.

ECF No. 1-2 at 25.

The court also found that Messino failed to

demonstrate prejudice:

Regarding the second prong the Court finds that the Defendant has failed to show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. In fact, as previously noted, it is evident that Mr. Kaigh's representation of the Defendant was successful in that the jury found the Defendant guilty of a lesser included charge than Purposeful and/or Knowing Murder and found the Defendant guilty of Aggravated Manslaughter. This Court finds that the second prong of the <u>Strickland</u> Test has not been satisfied.

ECF No. 1-2 at 16-25.

On this record, Messino has failed to demonstrate that the

state courts' findings were contrary to or an unreasonable

application of <u>Strickland</u> and its progeny, or based on an

unreasonable determination of the facts in light of the

evidence.

Deferring to the PCR court's detailed credibility findings,

<u>see</u> 28 U.S.C. § 2254(e)(1), the Court finds that the state

courts' determination that counsel did not render deficient
performance was not unreasonable.  The record well supports the
state courts' findings that counsel (a) made extensive efforts
to locate expert witnesses willing to testify favorably on
behalf of the defense and (b) made a strategic decision to hire
Dr. Adams to provide an opinion supporting the defense theory of
the case.  Strickland, 466 U.S. at 689 (strong presumption that
counsel is effective and the courts must be "highly deferential"
to counsel's reasonable strategic decisions); Duncan v.
Morton, 256 F.3d 189, 198 (3d Cir. 2001) (factual determinations
that are "well-supported and subject to the presumption of
correctness" are not "unreasonable").

     The record further demonstrates that counsel's performance
was reasonable given the facts of the case and the options
available to him.  See ECF No. 7-3 at 42 (Kaigh: "almost from
the start my concern was with finding a qualified medical expert
in this case, because of the complexity of the injuries to the
child, and the rare syndrome that he suffered from"); id. at 104
(Kaigh: "Dr. Speth's actual theory was that this was MPS
related.  That the concentration of iron in the abdomen of this
child was the protein storage disease.  And, Dr. Adams was the
only doctor willing to adopt that point of view.  And, it was
proven when the slides showed that there was, in fact, a high
concentration of these . . . Hurler-Scheie in this child's

38

abdomen."); ECF No. 7-1 at 135-36 (Messino acknowledged that he was present in court when counsel cross examined the State's witnesses and answered "yes" to the question, "[W]ould you acknowledge that even Jaime Kaigh got the State's experts to admit that the defense's theory was possible?"); see also, e.g., Hardy v. Lamas, No. 13- 02539, 2016 WL 8609571, at *6 (M.D. Pa. Nov. 7, 2016) ("Hardy maintains that Attorney Remy 'should have sought out a forensic pathologist or an expert in shaken baby syndrome, and such experts abound, to review Mr. Hardy's case.' Nonetheless, Hardy remains unable to identify a single medical expert that would have been willing to testify at trial that the baby's injuries were most likely accidental, despite over a decade elapsing since his conviction and sentence.") (citation omitted), report and recommendation adopted, 2017 WL 1134401 (M.D. Pa. Mar. 27, 2017).

Counsel's performance does not become deficient simply because his decision to hire Dr. Adams may not have worked in favor of the defense.  See Strickland, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); Marshall v. Hendricks, 307 F.3d 36, 85 (3d Cir. 2002) (the existence of alternative, even more preferable or more

39

effective, strategies does not satisfy the first element of
the Strickland test); Lewis v. Mazurkiewicz, 915 F.2d 106, 115
(3d Cir. 1990) ("[W]hether or not some other strategy would have
ultimately proved more successful, counsel's advice was
reasonable and must therefore be sustained."); United States v.
Gray, 878 F.2d 702, 711 (3d Cir. 1989) ("the range of reasonable
professional judgments is wide and courts must take care to
avoid illegitimate second-guessing of counsel's strategic
decisions from the superior vantage point of hindsight").  Thus,
Messino has not established a basis for habeas relief on his
claim that counsel was ineffective in hiring Dr. Adams.

The state courts also reasonably found that a determination
as to the exact form of MPS from which D.R. suffered would not
have changed the outcome because it was Messino's conduct,
including his silence during the rendering of life-saving
efforts, that led to D.R.'s death.  Thus, Messino's argument
that counsel was ineffective for failing to obtain follow-up
testing or consultation with the Australian doctors also does
not provide a basis for habeas relief.

Finally, Messino's allegation that the PCR court "ignored"
Dr. Speth's testimony is without merit.  The record is clear
that the PCR judge heard, considered, and analyzed the relevance
of Dr. Speth's testimony, including his sclerosing messenteritis
theory, to Messino's ineffective assistance of counsel claim.

Moreover, there is no evidence that presenting this alternate
diagnosis to the jury would have changed the outcome, as it
would not have negated Messino's conduct on the day of D.R.'s
death, his statements to the police, or the State's theory of
the case that D.R.'s death was caused by blunt force trauma to
his abdomen.  See, e.g., Nesto v. Horton, No. 21-225, 2023 WL
21436, at *8 (W.D. Mich. Jan. 3, 2023) ("[E]ven if an expert had
testified that the injuries [to Petitioner's daughter] were
likely caused by an accident, neither Dr. Lishawa's testimony
for the prosecution nor Petitioner's admissions to police would
have been entirely negated."); Hardy, at *7 (M.D. Pa. Nov. 7,
2016) ("There is no reason to believe that the jury would have
credited the plastic football explanation for the baby's brain
injury after rejecting Hardy's explanation that the baby fell
from the couch, particularly given that the testimony from the
Commonwealth's two expert witnesses that the baby's death was
caused by non-accidental trauma is equally damning of both
theories").  Accordingly, Messino's allegation that the PCR
court ignored Dr. Speth's testimony does not provide a basis for
habeas relief.

For these reasons, the state courts' rejection of these
claims was not contrary to or an unreasonable application of
Strickland and its progeny, or based on an unreasonable

41

determination of the facts in light of the evidence.  Habeas
relief on Grounds Two, Four, and Seven will be denied.

      2.   Failing to Call Character Witnesses (Ground Five)

    Messino argues that counsel was ineffective for "ignor[ing]
the [33[8]] character witnesses who would have testified at trial
as to [Messino's] exemplary character."  ECF No. 1 at 18-19; ECF
No. 11 at 29.  Messino asserts that the State "presented Messino
as a cold, calculating, child abuser," and "the fact that he did
not have the type of character to cause a toddler injury and
death could have raised reasonable doubt."  ECF No. 1 at 18.

    The State responds that counsel's decision to forgo
character witnesses was strategic.  The State asserts that,
given "defendant had already admitted lying about how the victim
got his injuries," (a) "it is entirely reasonable that an
attorney would have concern that a jury would disregard anything
a character witness says because it appears disingenuous after
the known falsehood," and (b) "the strong possibility existed
that highlighting that lie (through cross examination of
character witnesses) could cause a jury to believe that the
delay in learning what actually happened to the baby very easily
could have contributed to the death of the victim."  ECF No. 7
at 18-19.

---

[8] Messino cites this number as 35 in his reply brief. ECF No. 11
at 29.

The PCR court summarized the relevant hearing testimony on this issue as follows:

> [T]rial counsel made it quite clear on the record that he did not call character witnesses as to Mr. Messino's relationship with [D.R.], because most of the witnesses he was aware of had nothing favorable to say on his behalf.
>
> > Prosecutor:  Did you receive transcripts, or summaries of the State's witnesses, of what you expected them to testify to?
> >
> > Jaime Kaigh:  Yes.
> >
> > Prosecutor:  Did you feel a need to then have Alex (Esposito) go and interview them again?
> >
> > Jaime Kaigh:  I did not.
> >
> > Prosecutor:   And, why not?
> >
> > Jaime Kaigh:  I think to really answer that question accurately, I have to give you just a bit of the fabric of this case from my perspective.  When Mr. Messina -- when the first responders come, Mr. Messina's not honest with the first responders about what happened to this child.  He gives a taped statement that is not honest; he gives a second taped statement where he begins to describe accidently dropping this child. The facts of the case are that Hockfield then calls the police department and the taped statement is aborted because an attorney called and said, "I don't want my client to speak."  Laurie, the child's mother, and his co-defendant for a while, had told me repeatedly that all of her" family members didn't like Mr. Messino, and that the baby -- the child in question here would cry out when Mr. Messina came near it. And, the discovery reflected that, as well. Statements taken by family members said that.  When I said all of her family members, I specifically meant her aunts.

43

> She said her aunts didn't like Jim
> (Messino).  I didn't think from a tactical
> point of view there was anything to be
> gained by interviewing these people. (T:
> 2/20/2015, 26:21 - 28:2).

Defendant's petition focuses on the fact that over
thirty individuals would have testified as to his
reputation in the community and to his honesty.  Over
the course of Defendant's evidentiary hearing, [14
individuals, including immediate and extended family,
family friends, and co-workers] were called[.]

. . .

On direct examination of the aforementioned witnesses,
defense counsel Jill Cohen inquired as to James
Messina's reputation in the community as to
peacefulness, truthfulness, and law abidingness.  On
cross, Prosecutor Dianna Reed-Rolando posed a form of
the following question to nearly every proffered
character witness:  "Would your opinion [as to
truthfulness ] change if you knew Defendant lied to
the police about what happened in this case?" . . .

. . .

. . . [T]he State received non-responsive or
contradicting answers from nearly every single
witness.  Moreover, on direct examination, trial
counsel Jaime Kaigh was questioned by Prosecutor Reed-
Rolando as to his methodology in deciding whether or
not to call character witnesses.

> Prosecutor:  Did you ever discuss calling
> family members of Mr. Messino to testify?
>
> Jaime Kaigh:  Yes.
>
> Prosecutor:  Yes. And then, did you call
> them?
>
> Jaims Kaigh:  No.
>
> Prosecutor:  Well, why didn't you call them?
>
> Jaime Kaigh:  If you mean calling them as
> character witnesses to testify about his

> character, from my perspective it's
> extremely self-defeating when a person has
> lied, the defendant, to call character
> witnesses, recognizing what our character-
> witness testimony is limited to here in New
> Jersey, which is his reputation for honesty,
> voracity, lawabidingness or truthfulness.  I
> don't think you can pitch that to a jury
> when the Prosecutor's trying, subtly, to say
> that Mr. Messina's failure to be honest with
> the first responders may have led to this
> child's death, may have contributed to it.
> So, that's the last thing I really wanted to
> do was to put his character in issue, given
> that as the backdrop.  (T: 2/20/2015, 29:9 -
> 30:4).

The prosecutor subsequently inquired:

> Prosecutor:  Okay. Regarding in addition to
> family members, did you ever consider
> calling any other character witnesses on
> behalf of Mr. Messina?
>
> Jaime Kaigh:  No, I considered it but
> rejected it for the same reasons.  Calling
> someone to talk about his truthfulness when
> he lied, and the State's trying to prove the
> lie may have contributed to the death of
> this child, from a tactical point of view
> did not seem to be very smart to me.
> [T:2/20/2015, 31: 1 - 31:9).

ECF No. 1-2 at ECF No. 1-2 at 28-31.

The PCR court then conducted the following analysis in
rejecting Messino's claim:

> As to the issue of failure to present character
> evidence in this matter, the Court has evaluated the
> proffered testimony to determine whether counsel's
> failure to call, these witnesses at trial fell,
> "outside the wide range of professionally competent
> assistance" considered in light of all the
> circumstances of the case.

45

Here, this Court finds that trial counsel's decision
not to call character witnesses did not deprive
Defendant of a fair trial.  Defendant's objection to
the strategic decisions made by counsel not to pursue
this evidence does not satisfy the Strickland/Fritz
test. The court notes that Defendant was represented
at trial by counsel of his own selection, an attorney
who has a distinguished reputation as a trial lawyer
and who is regarded by many as being one of the ablest
criminal defense lawyers in the area.  Mr. Kaigh
elected not to call witnesses that could have put the
Defendant's character at issue, a matter which was
central to the State's case.  Further, as evidenced by
the witness' answers on cross examination, the Court
comes to the conclusion that their testimony would not
have been helpful to the Defendant in any event.
Thus, further analysis under Strickland/Fritz is not
required because the Defendant has failed to
demonstrate that his attorney's conduct fell below the
acceptable standard of professional conduct.

ECF No. 1-2 at 32-33 (citation omitted).

The decision of which witnesses to call to testify is

strategic, and therefore left to counsel.  Diggs v. Owens, 833

F.2d 439, 446 (3d Cir. 1987); see also Henderson v. DiGuglielmo,

138 F. App'x 463, 469 (3d Cir.  2005) ("Counsel's failure to

call a witness 'is precisely the sort of strategic trial

decision that Strickland protects from second-guessing.'").  A

decision not to use certain witnesses does not constitute

ineffective assistance of counsel if it "amounted to a tactical

decision within the parameters of reasonable professional

judgment."  Duncan v. Morton, 256 F.3d 189, 201 (3d Cir. 2001).

Here, the state courts' determination that counsel's

decision was tactical is well supported by the record, including

46

the testimony recounted above.  See also ECF No. 7-3 at 77
(Kaigh: "When a defendant lies to the police, and part of the
theory of the State's case seem[s] to be . . . that this child
might have been cared for differently by emergency personnel,
had Mr. Messino told the truth; character was about the last
thing I wanted to introduce into this trial. . . . [U]nder the
Rules of Evidence, his reputation for truthfulness, honesty, law
abidingness, are what we're limited to; I don't see how
highlighting with a defendant who's lied to the police is a very
good idea."); id. (Kaigh: "[W]hen a defendant gives a statement
and doesn't tell the truth about the cause of injury that might
impact the care of a victim who dies, I don't think it's very
good sense, from the hundreds of cases I've tried[,] to
introduce character testimony."); id. at 82 ("Q. So if you had,
for example, . . . his teacher from fourth grade . . . that kept
up with him, and had nothing but wonderful things to say about
him, how would that hurt the defense?  A. I think it would make
me seem incredible in from of the jury.  I think it would very
negatively impact my ability to convince this jury.  I think had
I done that, he would have been convicted of murder."); id. at
83 (Kaigh: "[T]hat [character] testimony wouldn't be accepted by
a jury, how honest he is, when on the night in question, the one
most important night of [D.R.'s] life, he didn't tell the truth.

47

I don't think you can credibly present that to a -- my judgment as a trial lawyer was I couldn't credibly present that.").

In the factual context of this case -- where Messino did not disclose what happened to D.R.'s mother, or to the first responders and the medical personnel at the hospital who were attempting to save D.R.'s life, and was not truthful in his first statement to the police -- the state courts reasonably found that counsel's decision to forgo calling character witnesses was the product of strategic judgment.  Accordingly, the state courts' rejection of these claims was not contrary to or an unreasonable application of Strickland and its progeny, or based on an unreasonable determination of the facts in light of the evidence. Habeas relief on Ground Five will be denied.

3.  Failing to Call Messino to Testify (Ground Eleven)

Messino argues that counsel was ineffective for failing to call him to testify in his own defense.  Id. at 25-26.  He asserts that: (a) "he and Kaigh had no meaningful discussion" about testifying; (b) "because [he] had been afraid to tell what had happened while being interrogated by prosecution detectives and delayed in describing information about the accidental fall during his contact with medical rescue personnel, he should have testified to explain those events"; and (c) "he had nothing to lose at that point" and should have testified so the jury could see "a person who worked full time, took off work to accompany

48

D.R. to doctors' appointments, helped Laurie and D.R., and even slept at the hospital during the admissions to CHOP." Id. at 25.

Messino concedes that he did not exhaust Ground Eleven. ECF No. 1 at 26 ("It was raised in the petition for [PCR] . . . and not raised in the appeal of the decision.  Defendant chooses to proceed by way of a petition for habeas corpus rather than file a second petition for postconviction relief, as time is of the essence.").  The State did not respond to Ground Eleven. Nonetheless, as noted above, a district court may deny a claim on the merits despite non-exhaustion.  Carrascosa, 520 F.3d at 254-55; 28 U.S.C. § 2254(b)(2).  Accordingly, the Court will address the substantive merits of this ground for relief.

Messino raised this argument before the PCR court, which rejected it as follows:

> Defense counsel points out that Attorney Kaigh was
> ineffective for failing to call Defendant to take the
> stand.  During the trial, an attorney's trial strategy
> is afforded great deference.  Attorney Kaigh claimed
> to have weighed the option of having Defendant
> testify, but decided it would not be of sound judgment
> because of the facts of the case, what Defendant did
> following the act, and what led up to the trial.  In
> this PCR motion, Defendant admitted dropping D.R. and
> not telling anyone.  Defendant admitted he did not
> tell paramedics at scene, the child's mother, hospital
> staff, DYES workers, or police about dropping
> accident.  Defendant further admitted he was not
> honest giving his statement to investigators.  In
> fact, Defendant testified that at the time of the
> incident, he thought his "dropping" of D.R. may have
> killed the child.  Defendant further admitted that he

49

> knew the staff needed to know about "the drop" to save
> the child's life, but still said nothing.  Lastly,
> defendant admitted the child's mother lied to police
> and the DYFS to protect him.  Attorney Kaigh weighed
> the stories, how they changed, and decided that the
> lies and hiding would not be beneficial to the
> Defendant.

ECF No. 1-2 at 36.

It is well-established that "the accused has the ultimate
authority to make certain fundamental decisions regarding the
case, [including] whether to . . . testify in his or her own
behalf."  Jones v. Barnes, 463 U.S. 745, 751 (1983); see also
Rock v. Arkansas, 483 U.S. 44, 49-56 (1987).  Here, trial
counsel testified as follows regarding his discussions with
Messino about Messino's right to testify and counsel's
recommendation that he not testify:

> Q.  During the preparation for this case, did you ever
> discuss with Mr. Messino whether or not he should
> testify?
>
> A.  Many times.
>
> Q.  Okay.  And, what were those discussion about?
>
> A.  Well, without fail, in every case, from the onset,
> I talk about with a client, whose potential or her
> potential to testify.  But, as you get closer to
> trial, naturally, in trial preparation, you focus in
> more on that.  So, our conversations including many
> discussions about his right to testify, his right not
> to testify.  That election, how it works in court; its
> ramifications; his right to have a jury charge, you
> cannot use against him the fact he chose not to
> testify.
>
> We discussed in this type of case, there's a pretty
> strong belief by many defense attorneys that the

citizen accused needs to get up and say, "I didn't do it," to beat a murder charge.

We also had discussions about the fact that although he has no prior, indictable criminal record, his is a difficult path if he testifies.  Because, how would he explain the lie that he told on the very first, to the first responders and his first statement to the police.

I felt that that was a decision best made during trial, when the state utters the words, "State rests," there would be time for Mr. Messino and I -- of course I told him the decision is his, with input from me. But, ultimately, the decision's always his.  And, I think the record in this case probably reflects that. That we had a detailed colloquy about his right to testify.

I would also say this, in preparation for his testimony -- and, again, I've tried a lot of cases, and I may have some negative interference; but, I believe we watched a video tape together; and I believe that I cross-examined him in preparation for what I thought his rigorous cross-examination might be.  So, he was prepared to testify.

Q.  And after the State rested, did you discuss whether or not he was to testify in detail with him?

A.  We did.

Q.  And, although it might have been your recommendation, whose decision was it ultimately for him not to testify?

A.  In any case, it's always the defendant's decision. In this case, it was his.

Q.  Okay.  And did you discuss that and make that clear to him?

A.  I did.

ECF No. 7-3 at 51-52.

Messino was also questioned at the PCR hearing about his decision not to testify at trial:

Q. Regarding your . . . decision not to testify, do you remember the Court and [Kaigh] asking you specific questions regarding that?

A. I do.

Q. Do you remember specific questions from Kaigh regarding whether it was your desire not to testify?

A. Yes.

Q. And do you remember specifically him asking you questions regarding whether or not he had prepared you to testify?

A. Yes.

Q. And do you remember telling him that he did do some preparation for you to testify?

A. Not to testify. He did not prepare me to testify.

Q. Do you remember when he asked you that and you acknowledged that there had been some?

A. I might have. I don't remember that off the top of my head.

Q. Do you remember that after Jaime Kaigh questioned you regarding testimony that Judge Tomasello then followed up?

A. I'm pretty sure, yes.

Q. And do you remember if Judge Tomasello specifically asked you if it was your desire not to testify?

A. Yes.

Q. Okay. And you told him that it was your desire not to testify.

A. Yes.

Q.   And do you also recall the judge asking you if you
were satisfied with the advice that Jaime Kaigh gave
you?

A.   Yes.

Q.   And do you remember telling the Court that you
were satisfied?

A.   Yes.

ECF No. 7-1 at 134-135.

Messino also testified as follows regarding his conduct

surrounding D.R.'s death:

Q.   . . . [A]fter you dropped him you put him down and
patted him after he cried out?

A.   Correct.

Q.   Laurie then came down, and you didn't tell her
what happened, did you?

A.   No.

Q.   In fact, you just went to bed as if nothing had
happened, correct?

A.   Correct.

Q.   Even after you heard [D.R.] in distress you never
told Laurie you dropped him, did you?

A.   No.

Q.   You, in fact, even called 9-1-1.

A.   Correct.

Q.   And you let her believe that he was having seizure
knowing that you had dropped him?

A.   I didn't let her believe.  That's what she had
told me, that he was shaking and like he was having a
seizure like he had the first time.

Q. However, you didn't tell her that his stress could have been from the fall, did you?

A. No, I did not. At that time everything was happening so fast.

Q. And after 9-1-1, shortly thereafter paramedics arrived, is that correct?

A. Correct.

Q. And when paramedics arrived they were trying to save his life, weren't they?

A. They were there, yes.

Q. And you didn't say anything to paramedics, did you?

A. No.

Q. You didn't tell them you dropped him?

A. No.

Q. You even saw the bruise on his abdomen when paramedics were trying to treat him, didn't you?

A. I believe I saw a small bruise, yes.

Q. Okay. And even after seeing the bruise, knowing you had dropped him, you still told paramedics nothing had happened?

A. No.

Q. You then drove to the hospital, correct?

A. Correct.

Q. And when you got to the hospital you saw Laurie, is that correct?

A. Yes.

. . .

54

Q.  Did you learn that when you had gotten to the
hospital that during the ambulance ride he had stopped
breathing?

A.  Somewhere – after I had gotten there, yes, but it
wasn't quite at first.

Q.  And learning that his life was in jeopardy you
still chose not to tell her that you had dropped him?

A.  I did not because I didn't know what was going on.

Q.  Okay, you didn't know what was going on, but you
knew doctors and nurses were trying to save his life,
is that correct?

A.  correct.

Q.  And you knew that they needed to know what
happened in order to save his life, correct?

A.  Correct.

Q.  In fact, nurses specifically came out to talk to
Laurie while you stood there asking what had happened.

A.  Yes.

Q.  And you said nothing.

A.  Yes.

Q.  And you knew it was important for them to treat
him to know if there was an injury, correct?

A.  Correct.

Q.  And you still said nothing as they were trying to
save his life.

A.  Correct.

Q.  You called the family.  Did you ever tell the
family that you had dropped him?

A.  Not until after I was questioned by the police.

.  .  .

55

Q.  . . .  [W]hen they were trying to resuscitate
[D.R.] did you know it was looking like it was not
going to be a good outcome?

A.  At one point they came out and said his heart had
stopped.

Q.  And even after knowing that you still said
nothing.

A.  I froze, yes.

Q.  Nurses and doctors specifically were asking if
anything happened, and you told them nothing.

A.  I told them nothing.

Q.  In fact, even as they were questioning Laurie you
stood next to her and you told her nothing.

A.  Correct.

Q.  You knew there was a bruise on the lower abdomen,
and you knew doctors saw that bruise, but you never
told them the baby was dropped, correct?

A.  Correct.

Q.  You knew that you had dropped him shortly before
9-1-1- was called, but you said nothing to doctors who
tried to save his life.

A.  Correct.

Q.  You then went to the police after [D.R.] had died
and you spoke with Detective Crane first, is that
correct?

A.  I believe it was Krane and/or Illas was there,
yes.

Q.  Was there another detective by the name of
O'Brien?  Were there two detectives in the room the
first time you spoke?

A.  I do remember an O'Brien.

Q.  Okay, and do you remember them specifically asking
you did you know how the injury occurred?

56

A.  He asked me if I knew how the injury occurred, yes.

Q.  And you told them you had no clue.

A.  I told -- I did not tell them I had dropped [D.R.], correct.

Q.  In fact, didn't Detective Crane specifically ask you did he fall or drop, and you told him no?

A.  Yes.

Q.  Did you then change that version and give a subsequent statement?

A.  After my first statement I had gone back and told them the truth, yes.

Q.  And you testified that you didn't tell anyone at first and you didn't tell Laurie because you didn't think it was serious.

A.  Correct.

Q.  Did you think it was serious when 9-1-1 was called?

A.  I knew something was going on, yes.

Q.  But, even then when you knew it was serious, you did nothing?

A.  I froze, yes.

ECF No. 7-1 at 138-42.

The record reflects that Messino was advised of his right to take the stand; he was aware that the decision whether to testify was his; and he decided on advice of counsel not to testify.  Accordingly, to the extent Messino is claiming that counsel was ineffective for not advising Messino of his right to testify, the claim is without merit.

57

Notwithstanding Messino's knowing and voluntary waiver of his right to testify, the state courts reasonably found that counsel was not ineffective for advising Messino not to take the stand.  The record, including the testimony recounted above, supports the state courts' conclusion that counsel's advice was the result of sound trial strategy because, as the PCR judge found, "the lies and hiding would not be beneficial to the Defendant."  ECF No. 1-2 at 36.  See, e.g., Byrd v. Collins, No. 10-2702, 2011 WL 5075165, at *10 (E.D. Pa. Feb. 15, 2011) ("trial counsel's advice not to testify falls within the objective standard of reasonableness, especially in light of the facts that the Commonwealth's case was substantially comprised of circumstantial evidence"), report and recommendation adopted, 2011 WL 5075032 (E.D. Pa. Oct. 25, 2011); Hodges v. Shannon, No. CIV.A. 08-CV-2483, 2009 WL 2413685, at *7-8 (E.D. Pa. Aug. 5, 2009) ("A criminal defendant has a constitutional right to testify on his own behalf, but defense counsel's alleged failure to call the defendant to the stand does not constitute ineffective assistance when a defendant is aware of his right to testify.") (citing Rock v. Arkansas, 483 U.S. 44, 53 n.10 (1987)); Pettaway v. Brown, No. 09-3587, 2010 WL 7800939, at *8 (S.D.N.Y. May 3, 2010) ("[P]etitioner's attorney advised his client of his right to testify and then convinced him that it would not be wise for him to do so -- a course of

action that is proper for a defense attorney.  Therefore, the
performance of Mr. Pettaway's attorney was not deficient."),
report and recommendation adopted, 2011 WL 5104623 (S.D.N.Y.
Oct. 26, 2011).

Messino has also failed to establish prejudice, as he has
not established that the outcome would have been different had
he testified.  See, e.g., Thomas v. Zon, No. 04-0471, 2009 WL
605231, at *12 (W.D.N.Y. Mar. 6, 2009) ("In hindsight, Thomas is
now convinced that his testimony would have resulted in a more
favorable verdict.  However, he has failed to demonstrate how
this is the case, and he therefore has failed to meet his burden
of demonstrating that he suffered constitutional prejudice as a
result of failing to testify.").  Thus, Messino is not entitled
to relief on this claim.  Habeas relief on Ground Eleven will
therefore be denied.

4.   Child Abuse Testimony (Ground Twelve)

Messino argues that counsel was ineffective for failing to
object to witness testimony opining that D.R.'s injuries were
the result of child abuse.  Id. at 26-27.  Specifically, two
treating doctors "who were not qualified as experts in abuse,"
were "allowed to give an expert opinion about abuse although it
was the ultimate issue in the case."  ECF No. 11 at 32.  In
support, Messino argues that counsel should have objected to
testimony from Dr. Gregg, the treating pediatric orthopedic

59

doctor at CHOP, which Messino sets forth in his petition as
follows:

> . . . [a]nd if we see a child who's 2 years old or
> less with that particular type of femur fracture
> without knowing anything – not – knowing that it's a
> week old and it is bothersome.  <u>But not knowing
> anything, there's an 80 percent probability that
> that's abuse. There's a 20 percent chance it wouldn't
> be abuse.</u> . . .
>
> [T]here was no doubt in my mind that somebody abused
> this kid. . .
>
> [or] I think somebody said, 'Well, he had a temper
> tantrum" and I said, 'well that's bullshit. It's not .
> . . it didn't happen that way.'  So we referred them
> to the Social Department for child abuse. . . .
>
> . . . [this] – you know, a lot of times we suspect
> child abuse.  And, you know, you're not sure so you
> want to protect the children; Because if you come in
> with a broken bone and its child abuse, the chances
> you come in the next year dead is 10 percent. . .
>
> So I actually called the people in Jersey three times
> over a period of about a month to tell them, like,
> 'don't be confused.  This is child abuse.  You have to
> find out what it is.  I don't care what your social
> worker tells you.  I'm telling you this doesn't happen
> normally in this – in this kid . . . that is only the
> second time in my life that I picked up the phone and
> called somebody personally about it . . . cause this
> was extreme example as far as I was concerned.

ECF No. 1 at 27.  Messino also argues that counsel should have

objected to the testimony of Dr. Kovacs, another treating

doctor, who allegedly[9] testified that two breaks in one leg was

"the hallmark of child abuse."  <u>Id.</u>

---

[9] As noted above, Messino did not provide the trial transcripts,
nor does his petition even cite page numbers in the trial
transcripts.  The Court is thus asked to take his word that his

Messino concedes that Ground Twelve is not exhausted. ECF No. 1 at 27 (This claim "was not specifically addressed in the direct appeal of the PCR"; however "Defendant chooses to proceed by way of a petition for habeas corpus rather than file a second petition for post-conviction relief, as time is of the essence.").  The State did not respond to this ground for relief.  Addressing the merits of this claim, as permitted by 28 U.S.C. § 2254(b)(2), the Court finds that Messino has not established that counsel was ineffective for failing to object to this testimony.

First, Messino alleges in conclusory fashion that these witnesses, both treating pediatric physicians, were not qualified to opine that the injuries they observed were consistent with abuse, but he provides virtually no support for this allegation.  Conclusory allegations are insufficient to support habeas relief. *See United States v. Thomas,* 221 F.3d 430, 438 (3d Cir. 2000); see also ECF No. 7-3 at 198–99 (Kaigh: "I think that [Dr. Gregg's] opinion is probative, and also prejudicial as anything that is probative is; and, I think under a Rule 104 analysis, it's probably going to come in.  He's an expert testifying about it." "I don't believe in frivolous

petition accurately quotes the trial testimony, and the Court is unable to determine whether the portions of testimony quoted in the petition are complete because they contain various ellipses indicating omitted text.

objections; so even in retrospect I probably wouldn't have objected to that.").

Second, Messino alleges in conclusory fashion that Drs. Gregg and Kovacs are opining on "the ultimate question" of "whether there was abuse and neglect."  ECF No. 11 at 32.  But the ultimate issue on the endangering charge was not whether the child had been abused; it was whether Messino had abused the child.  The testimony that Messino now objects to opines only that the child had likely been abused; it does not opine on the ultimate issue, i.e., whether Messino was the abuser.  See, e.g., Viers v. Warden, 605 F. App'x 933, 943 (11th Cir. 2015) (petitioner failed to establish ineffective assistance of counsel where witness testified about who the victim accused of abusing her without concluding who actually abused her; such testimony "did not impermissibly go the ultimate issue of who abused" the victim).

Even if it had, however, Messino does not cite a Supreme Court case holding that trial counsel was ineffective under the Sixth Amendment for not objecting to testimony about an ultimate issue in the case.  See, e.g., Moses v. Payne, 555 F.3d 742, 761 (9th Cir. 2009) (noting that the Supreme Court has not held that the Constitution forbids an expert from testifying to an ultimate issue in a case); Baker v. Warren, No. CIV. 07-CV-11065, 2010 WL 1257788, at *4 (E.D. Mich. Mar. 29, 2010) ("there

is no clearly established federal law as determined by the
Supreme Court which suggests that admission of [opinion
testimony that goes to an ultimate issue in the case] violates
the Constitution"); see also Fed. R. Evid. 704 ("An opinion is
not objectionable just because it embraces an ultimate issue.").

Finally, Messino has not established prejudice.  This is
particularly so given that defense witnesses testified that the
injuries were not the result of abuse.  See, e.g., Hartzell v.
Sauers, No. 10-1236, 2011 WL 484181, at *3 (M.D. Pa. Feb. 7,
2011) ("in regard to prejudice, as the superior court noted,
based on the evidence at trial, including that Petitioner had
his own expert, who testified in opposition to the
Commonwealth's expert, we cannot say the court was unreasonable
in its decision").

Thus, Messino has not established an entitlement to relief
on the basis that counsel was ineffective for failing to object
to the quoted testimony.  Habeas relief on Ground Twelve will be
denied.

            5.   Theory of the Case (Ground Nine)

Messino argues that counsel was ineffective for failing to
"present a credible or cohesive defense theory for the case"
during closing arguments, though, as noted above, he does not
provide transcripts of said closing arguments.  Id. at 22-23.
He argues that counsel was ineffective because he argued that

Mollo, the natural father, was most likely the abuser, yet Mollo did not see D.R. after the femur fracture and could not have caused the other injuries -- the corneal injury, the pulled hair, the scrotal injury, the abdominal injuries -- and was not at the home on the morning of the death.  ECF No. 1 at 23.

Counsel further "attacked and defamed the entire medical staff at Children's Hospital of Philadelphia arguing that this was not a hospital that you would bring your child to if he or she were sick. It was his tactic to have the jury disbelieve, Dr. Christian, Dr. Kaplan, Dr. Gregg, Dr. Kovacs and Dr. Nance, without putting forth any evidence of the same."  Id.  He also "argued in his closing, that Dr. Adams' testimony was 'compelling' and 'riveting,'" and he said "so what that Adams wrote two reports."  Id.  Finally, he "suggested to the jury that if Messino was responsible for the injuries, 'it was manslaughter, aggravated manslaughter, not purposefully done.'" Id.

Messino concedes that he did not exhaust Ground Nine.  Id. at 23 (The claim was "not addressed specifically . . . in the direct appeal of the denial of the [PCR]"; however "Defendant chooses to proceed by way of a petition for habeas corpus rather than file a second petition for post-conviction relief, as time is of the essence.").

The State responds that counsel's closing did not amount to
ineffective assistance of counsel because his arguments "were a
matter of strategy," and Messino cannot show that "with a
different closing, the outcome would have been any different."
ECF No. 7 at 23.  Despite non-exhaustion, the Court will address
the merits of this claim, as permitted by 28 U.S.C.
§ 2254(b)(2).

Although the "right to effective assistance extends to
closing arguments," "counsel has wide latitude in deciding how
best to represent a client, and deference to counsel's tactical
decisions in his [or her] closing presentation is particularly
important because of the broad range of legitimate defense
strategy at that stage." Yarborough v. Gentry, 540 U.S. 1, 5-6
(2003). "Judicial review of a defense attorney's summation is
therefore highly deferential and doubly deferential when it is
conducted through the lens of federal habeas." Id. at 6.
Further, "a closing argument is usually given in a manner
consistent with the theory of the case; a summation cannot
therefore be deficient in a manner sufficient to support a claim
of ineffective assistance of counsel unless the theory and
method of implementing the theory were unreasonable under the
circumstances." United States v. Ciancaglini, 945 F. Supp.
813, 825 (E.D. Pa. 1996).

Kaigh testified as follows regarding the defense theory of the case:

> [D.R.] suffered from MPS.  There were allegations of child abuse that had to be addressed in conjunction with the allegation of murder and homicide.  The child was reported to have scratched corneas.  Cloudy corneas are part of MPS.
>
> The child was reported to have hair pulled out, when in reality it was alopecia.  A disease causing the hair loss.
>
> . . .
>
> The child was reported to have had multiple leg fractures, yet, they can be explained as toddler fractures.  The second fracture coming when he was wearing a cast.
>
> So, all the allegations of child abuse could be explained medically, either through the walking cast that he had, the toddler fractures, the alopecia, the self-abusive behavior of MPS.
>
> So . . . my theory of the case was consistent with [defendant's] last statement to the police, he accidentally dropped this child.  But, that accident -- he was in no way a child abuser, all the abuse can be explained; and that not every accident is reckless.
>
> Certainly, the goal of this case was to get away from knowing or purposeful conduct, which . . . means murder. So, when faced with a confession, that, [defendant] accidentally dropped the child, the only theory of this case, really, and borne out through cross-examination of all the doctors, was that this was an accidental death. And, the main contributor was the MPS. Which also explained away many of the allegations of child abuse.
>
> I think the case began . . . with Mimi Molo at some early point.  I vigorously cross-examined Mimi Molo, trying to create the impression he was the abuser.

ECF No. 7-3 at 107.

66

The closing arguments Messino identifies in support of this claim are consistent with the defense theory of the case. First, closing arguments related to cross-examination of the State's witnesses, Dr. Adams's testimony, and Mollo's interactions with D.R. support the defense theory that the various injuries were not the result of abuse because there were alternative explanations for the injuries, and its alternative theory that if the injuries were the result of abuse, the abuse had most likely been inflicted by Mollo, not Messino.  Second, an argument referencing manslaughter supports the defense theory that if the jury were to find Messino responsible for the injury that caused D.R.'s death, it should convict him of manslaughter rather than murder.

Given Messino's risk of a murder conviction, counsel's decision to present these alternatives was reasonable.  See ECF No. 7-3 at 79 (Kaigh: "The goal of the defense was to show that, first of all, to avoid the murder charge, by showing there was no purposeful conduct here.  If Messino was responsible for these injuries, it was in the manslaughter, aggravated manslaughter, not purposely done."); ECF No. 7-3 at 169 (Kaigh: "[T]he State was trying to prove a purposeful and knowing murder.  Mr. Messino had basically confessed to a reckless or to an accidental death and I felt that . . . having lied about the way it happened, he was in danger of getting convicted of

67

murder."); ECF No. 7-3 at 178 (Kaigh: "The cause of death in this case was blunt force trauma to the abdomen with healing injuries that were chronologically dated by [the medical examiner]. . . . The issue in this case is did [Messino] drop this child, was it an intentional murder, an accidental death? And really part of my trial strategy was trying to debunk the purposeful murder."); see also Miller v. Luther, No. 15-6456, 2016 WL 9281385, at *8-9 (E.D. Pa. Dec. 14, 2016), (where, during closing, counsel argued "for a conviction of voluntary manslaughter rather than first-degree murder under the theories that [petitioner] either committed the crime in the heat of passion or mistakenly believed his life was in danger," petitioner's ineffective assistance claim was rejected because there was support in the record that the argument was supported by professional judgment), report and recommendation adopted, 2017 WL 2957823 (E.D. Pa. July 10, 2017).

Counsel's theory of the case was a reasonable strategic decision grounded in the facts, and Messino's complaints about counsel's closing arguments are not inconsistent with counsel's theory of the case. Thus, Messino has failed to overcome the presumption that counsel exercised sound trial strategy. See Strickland, 466 U.S. at 681 ("Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be

respected in these circumstances if they are based on professional judgment."). Accordingly, Messino has not established deficient performance.

Moreover, Messino has not shown prejudice; rather, counsel's arguments were successful to the extent that Messino was acquitted of murder, which carried a much higher sentence -- potentially life -- than Messino ultimately received. Habeas relief on Ground Nine will be denied.

### 6.   Third-Degree Endangering Charge (Ground Ten)

Messino argues that counsel was ineffective for failing to (a) request a charge on the lesser-included third-degree endangering the welfare of a child or (b) ask the jury to decide the lesser-included offense on the verdict sheet. ECF No. 1 at 24-25. Messino asserts that this charge should have been requested because "Title 2C: 24-4, Endangering the Welfare of a Child, makes distinctions between a person who had supervisory responsibilities over the child or was merely with the child at the time of the alleged abuse or neglect," and here, "there was little if no evidence that Defendant had any supervisory role," "nor did he stand in loco parentis." Id. at 24.

Messino concedes that Ground Ten is not exhausted. Id. at 24-25 (This claim was "not specifically raised in the direct appeal of the denial of the PCR"; however "Defendant chooses to proceed by way of a petition for habeas corpus rather than file

69

a second petition for post-conviction relief, as time is of the essence.").

The State responds that counsel was not ineffective for failing to ask for a charge on the lesser included third-degree offense. For support, the State relies on the Appellate Division's rejection on direct review of Messino's in loco parentis argument (which, the State asserts, is the difference between the second and third-degree endangering offense); specifically, the Appellate Division's finding that "'[g]eneral and ongoing responsibility' for the care of a child may arise from informal arrangements 'such as a person's cohabitation with the child's parent.'" ECF No. 7 at 24 (citing Messino, 378 N.J. Super. 559, 581 (2005)). The State further argues that counsel's failure to request the charge was strategic. Id.

Addressing the merits of this claim, as permitted by 28 U.S.C. § 2254(b)(2), the Court finds Messino has not established that counsel was ineffective for failing to request a charge on third-degree endangering.

N.J.S.A. § 2C:24-4(a)(2), Endangering the Welfare of a Child, provides:

(2) Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who causes the child harm that would make the child an abused or neglected child . . . is guilty of a crime of the second degree. Any other person who engages in conduct or who causes harm as described in

this paragraph to a child is guilty of a crime of the
third degree.

Id.

On direct review, the Appellate Division found the second-

degree endangering charge was proper:

Defendant also argues that the instructions on the
endangering charge were erroneous.  We disagree.  On
the endangering charge, the judge instructed the jury
in pertinent part:

The second element is that the defendant has
a legal duty for the care of the child or
assumed responsibility for the care of the
child.  A person having a legal duty for the
care of a child means a parent or guardian.
Parent or guardian means any natural parent,
adoptive parent, foster parent, step-parent,
or any person who has assumed responsibility
for the care, custody or control of a child
or upon whom there is a legal duty for such
care.  A person who has assumed the
responsibility for the care of the child
includes any person with whom a child is
living at the time the offense is committed.

Defendant argues that the instructions failed to
adhere to State v. Galloway, 133 N.J. 631, 628 A.2d
735 (1993), where the Court held that the second-
degree endangering requires proof that the defendant
assumed "a general and ongoing responsibility" for the
care of the child and established a "continuing or
regular supervisory or caretaker relationship" with
the child.  Id. at 661, 628 A.2d 735.  Defendant
asserts that the charge here was flawed because the
instructions allowed the jury to find defendant guilty
merely because defendant was living with D.R. at the
time the offense was committed.

Again, we disagree.  The Court in Galloway explained
that "general and ongoing responsibility" for the care
of a child may arise from informal arrangements "such
as a person's cohabitation with the child's parent."
Ibid.  Although the trial judge here did not
incorporate in his charge a statement regarding

71

"general and ongoing responsibility" for a child, the
instruction nevertheless required proof that defendant
assumed responsibility for the "care, custody or
control of a child," and specifically made reference
to precisely the sort of informal arrangement that
the Galloway Court stated would be evidence of
"general and ongoing responsibility" for a child.  The
charge was proper.

Messino, 378 N.J. Super. at 580-81.

The jury found sufficient evidence to convict on the

second-degree charge.  Given the undisputed facts that, inter

alia, Messino lived full-time with D.R., took him to doctors'

appointments, and was partially responsible for putting the

child to bed in the evenings, see Messino, 378 N.J. Super. at

569-72, there was sufficient support for the jury to find

"general and ongoing responsibility" for D.R., as necessary to

convict Messino of second-degree endangering.  See State v.

McInerney, 428 N.J. Super. 432, 442-43 (App. Div. 2012) (noting

the requirement of "general and ongoing responsibility for the

care of the child" may be based on cohabitation with the child's

parent) (citation omitted).

To show prejudice resulting from counsel's alleged

deficient performance in not requesting the third-degree charge,

Messino must show that there is a reasonable probability that

the jury would have convicted him of third-degree endangering

and not second-degree endangering had counsel made the request.

See Breakiron v. Horn, 642 F.3d 126, 138 (3d Cir. 2011); Nayee

72

v. D'ilio, No. 15-1288, 2021 WL 1589352, at *16 (D.N.J. Apr. 23, 2021).  In light of Messino's caretaking responsibilities for D.R. and the jury's finding of guilt on the second-degree charge, Messino has failed to make this showing.  See ECF No. 7-3 at 191 (Kaigh: Messino "was" living [with Laurie Roberts] and had responsibilities with the child."); 7-1 at 91 (Messino's mother acknowledging that Messino went to doctors' appointments with Laurie Roberts and D.R.); id. at 121 (Kaigh explaining that he put D.R. to bed because it "was something that Laurie wanted me to do to establish that I was going to be around.  She wanted [D.R.] to get used to me being around."); see also Geschwendt v. Ryan, 967 F.2d 877, 884 n.13 (3d Cir. 1992) (conviction of an offense higher up on the ladder is a reliable indicator that a jury would not have convicted of the least included offense that was not charged).  Accordingly, habeas relief on Ground Ten will be denied.

       7.  Apprendi (Ground Three)

    Messino argues that counsel was ineffective for failing to "mold the jury verdict" in violation of Apprendi v. New Jersey, 530 U.S. 466 (2000).  ECF No. 1 at 15-16.  He contends that because of the way the verdict sheet was structured, there was no way to know on which dates the jury found that he had committed acts of abuse against the victim.  ECF No. 1 at 15.  Messino asserts that counsel never requested that the acts

before May 31, 1998 (the tibia fracture, femur fracture, corneal abrasion, missing hair, and swollen and bruised right testicle), and the acts on May 31, 1998 (the acts causing D.R.'s death), be separated in the verdict sheet or in the instructions; thus "it could not be determined whether the jury found that Defendant committed all of the acts of abuse, beyond a reasonable doubt." Id. at 15–16.

Messino argues that, "in violation of Apprendi, the sentencing court ignored the argument and believing that Defendant had caused all of the acts of abuse, found aggravating factors one and two and ordered consecutive sentences." Id. at 15–16.  However, "[s]ince the jury found Defendant not guilty of knowing and purposeful murder and found Defendant guilty of the death by causing the death, recklessly, it is possible that the jury would have found him not guilty of causing the other medical conditions," and "the convictions would have been concurrent and below the presumptive sentence." Id. at 16.

Messino concedes that he did not exhaust Ground Three.  Id. ("PCR Appellate counsel did not specifically raise the Apprendi violation but Defendant brings this petition for writ of Habeas Corpus rather than filing a second post-conviction relief petition").  The State responds that Messino's sentence did not violate Apprendi because the Appellate Division on direct appeal held that "there was sufficient evidence to establish that

74

defendant had physically abused D.R. prior to May 31, 1998 and therefore committed separate and distinct crimes." ECF No. 7 at 15-16 (quoting Messino, 378 N.J. Super at 586).  As with other unexhausted claims, the Court addresses the merits of this claim, as permitted by 28 U.S.C. § 2254(b)(2).

In Apprendi, the Supreme Court held "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 489.  Blakely v. Washington clarified Apprendi, holding that a judge-imposed sentence in the context of a jury trial that increases the penalty beyond the statutory maximum must be based upon facts found by the jury beyond a reasonable doubt.  542 U.S. 296, 303-04 (2004).  Apprendi is not an issue here because the sentence did not go beyond the statutory maximum.

Messino was convicted of aggravated manslaughter, N.J.S.A. § 2C:11-4, and second-degree endangering the welfare of a minor, N.J.S.A. § 2C:24-4(a).  Messino, 2010 WL 5288503, at *1.  Aggravated manslaughter carries a maximum penalty of 30 years.  N.J.S.A. § 2C:11-4 ("Aggravated manslaughter . . . is a crime of the first degree and upon conviction thereof a person may . . . be sentenced to an ordinary term of imprisonment between 10 and 30 years.").  Messino was sentenced to 22 years, with parole ineligibility as prescribed by NERA.  Messino, 378

75

N.J. Super. at 569.  Second-degree endangering the welfare of a child carries a maximum penalty of 10 years.  N.J.S.A. § 2C:11-4 ("In the case of a crime of the second degree, for a specific term of years which shall be fixed by the court and shall be between five years and 10 years.").  Messino was sentenced to a consecutive sentence of 7 years, with parole ineligibility as prescribed by NERA.  Messino, 378 N.J. Super. at 569. Accordingly, as Messino did not receive a sentence that exceeds the statutory maximum, there is no Apprendi violation. See United States v. Kent, 93 F. App'x 460 (3d Cir. 2004) (no Apprendi error because sentence did not exceed statutory maximum); Miller v. Cathel, No. 06-6116, 2016 WL 4718139, at *8 (D.N.J. Sept. 9, 2016) ("Petitioner was not sentenced beyond the statutory maximum for first-degree aggravated manslaughter. Therefore, Apprendi does not apply to his sentence."); Wanyoike v. Superintendent Kerestes, No. 14-3016, 2015 WL 5179221, at *8 (E.D. Pa. Sept. 3, 2015) ("Because these sentences did not exceed the statutory maximum, Wanyoike's rights under Apprendi were not implicated.").

Messino's arguments relating to aggravating factors, consecutive sentences, and presumptive terms also do not support an Apprendi violation.  See Burns v. Warren, No. 13-1929, 2016 WL 1117946, at *44-45 (D.N.J. Mar. 22, 2016) ("To be clear, the Apprendi line of cases apply to situations where a

76

defendant's sentence exceeds the <u>statutory maximum</u> and do not make reference to a presumptive term"; "Petitioner's assertion that he has the right to have a jury, not a judge, make the aggravating-factors findings . . . demonstrates a clear misunderstanding of the law and of the holdings in <u>Apprendi</u> and its progeny.") (quotations and citation omitted; emphasis in original); <u>see also</u> <u>id.</u> at *45 ("[T]o the extent Petitioner asserts that factual findings by a jury are required before a court may impose consecutive sentences, this claim is denied as meritless.  Nothing in the <u>Apprendi</u> line of cases -- or any other Supreme Court case -- imposes such a requirement.").

Accordingly, as Messino's sentence did not exceed the statutory maximum, he has failed to establish an <u>Apprendi</u> violation.  And as there was no <u>Apprendi</u> violation, he has failed to establish ineffective assistance of counsel for failing to raise an <u>Apprendi</u> claim.  <u>United States v. Sanders</u>, 165 F.3d 248, 253 (3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument").  Habeas relief on Ground Three will be denied.

8.   Counsel's Departure from Firm (Ground Six)

Messino argues that counsel "acted unethically" by failing to disclose to Messino (a) he was discussing with his partners leaving the firm, (b) he left the firm prior to sentencing, and

77

(c) his reason for leaving the firm.  Id. at 19.  Messina

alleges that "[g]iven that appalling performance at the trial,

Defendant would have hired a different law firm and the result

would have been different."  Id. at 19.  Messino concedes that

he did not exhaust this claim.  Id. (This claim was "not raised

on direct appeal of the denial of the [PCR]. Defendant chooses

to proceed by way of a petition for habeas corpus rather than

file a second petition for post-conviction relief, as time is of

the essence.").

The State responds that "[e]ven if this were a violation of

the Rules of Professional Conduct (which it is not), this would

not rise to the level of ineffective assistance of counsel"

because Messino "could have sought new counsel at any time, no

matter which firm trial counsel worked for."

Addressing the merits of this claim, as permitted by 28

U.S.C. § 2254(b)(2), the Court finds that Messino's conclusory

allegation of unethical conduct does not raise a violation of

constitutional law or amount to ineffective assistance -- and

Messino makes no effort to argue that it does.  This claim

alleges only "unethical" conduct, not constitutionally

"ineffective" conduct, and fails to explain how Messino's

decision to leave his firm and return to solo practice rendered

his performance deficient, or how the outcome of the trial would

have been different had he not been in negotiations to leave his prior firm.[10]

9.    Cumulative Errors (Ground One)

Messino argues that counsel was ineffective on the basis of his cumulative errors, including a failure to adequately investigate the case and prepare for trial.  ECF No. 1 at 9-12. The State responds that Messino's claims are a matter of trial strategy and do not fall below the reasonable standard for representation.  ECF No. 7 at 12.  The State further asserts that this claim fails because counsel was successful in his strategy insomuch as Messino "was charged with first degree murder with a possibility of life in prison," but "was convicted of aggravated manslaughter, thereby limiting his exposure."  Id. at 13-14.

Giving appropriate deference to the state courts' credibility determinations in light of Messino's failure to rebut the presumption that the state court's factual findings are correct, see 28 U.S.C. § 2254(e)(1), and for the reasons

---

[10] Additionally, the record contradicts Messino's allegation that counsel did not disclose to Messino that he left his firm. See ECF No. 7-3 at 156 ("I left the firm in between [Messino's] conviction and his sentencing date."); 157 ("I think I did tell [the Messinos] before the sentencing that I was no longer with Hockfield's firm."]; ECF No. 7-1 at 61 (Messino's mother acknowledged that "right after the trial, probably when we were waiting for the jurors to come back," Kaigh told her he was leaving his firm.).

discussed above and in the state court opinions affirming
Messino's conviction and denying his claims of ineffective
assistance of counsel, the Court finds that the state courts
reasonably determined that Messino failed to establish deficient
performance or that he was prejudiced by counsel's
representation at trial.

To the contrary, the state courts reasonably found that
counsel, inter alia, reviewed discovery, developed a defense,
secured expert witnesses, made sound strategic decisions
regarding the presentation of witnesses, and was partially
successful by obtaining a conviction of aggravated manslaughter
rather than murder.  See Messino, 2019 WL 208098, at *3-5
(detailing the steps counsel took in defending the case and
finding that "Kaigh was successful in his representation of
defendant because the jury found defendant guilty of the lesser-
included aggravated manslaughter charge, rather than knowing or
purposeful murder); see also Salomon v. Nogan, No. 17-426, 2018
WL 623644, at *10 (D.N.J. Jan. 29, 2018) ("[T]he record suggests
that counsel fully explored the discovery in Petitioner's case,
and used that to pursue a reasonable defense -- the medical
causation defense presented at trial.  Petitioner has thus
failed to show that he was prejudiced, and is not entitled to
relief on this ground."); Walker v. Davis, No. CV 19-13983
(KM), 2022 WL 17751305, at *9 (D.N.J. Dec. 19, 2022) ("the state

courts reasonably found that Walker did not establish prejudice because counsel's performance resulted in Walker's acquittal of felony murder and robbery charges"); <u>Scott v. Sobrina</u>, No. CIV.A. 09-1081 2010 WL 8128749, at *16 (E.D. Pa. Jan. 29, 2010) ("Trial counsel emphasized Scott was not seen or found with a weapon.  Scott was not convicted of a weapon charge, attempted murder, or murder.  Such evidence supports the reasonableness of the state courts['] application of <u>Strickland</u>."), <u>report and recommendation adopted</u>, 2011 WL 6337566 (E.D. Pa. Dec. 16, 2011).

On these facts, the state courts' rejection of Messino's claim of cumulative error was not contrary to or an unreasonable application of <u>Strickland</u> and its progeny, or based on an unreasonable determination of the facts in light of the evidence.  Habeas relief on Ground One will be denied.

10.  Alleged PCR Judge Errors (Ground Eight)

Messino argues that he is entitled to habeas relief because the PCR judge "adopted the bald, self-serving assertions of trial counsel" and "ignored [Messino's] evidence in its entirety."  ECF No. 1 at 21-22.  The State responds that pursuant to New Jersey law, review of credibility and factual determinations are given great deference, and here, Messino "cites no claim which suggests the judge unreasonably

81

interpreted federal law or made a decision contrary to federal law." ECF No. 7 at 32.

Ground Eight is without merit.  The PCR judge presided over a 17-day hearing (ECF No. 1-2 at 7–8), during which he, inter alia, listened to the testimony of over 20 witnesses, made evidentiary rulings, asked clarifying questions, and took many pages of notes.  See, e.g., ECF No. 1-2 at 7–8, ECF No. 7-4 at 24 (PCR judge: "I'm up to some 50 pages of notes."); id. at 62 (PCR judge: "I've reviewed the original briefs, the supplemental briefs, the written opinions, the doctors' opinions, the transcripts, transcripts of the hearings, and . . . based upon my careful review, that the defendant's motion for post-conviction relief should be, and is, denied.").  In his 36-page opinion denying Messino's petition, the judge referenced the trial transcripts and summarized the parties' submissions, and indicated he reviewed and considered all of it:

> On January 18, 2008, Defendant's current counsel, Jill R. Cohen, Esq, filed a "Brief and Exhibits in Support of Petitioner's Petition and Amended Petition for Post-Conviction Relief."  The State subsequently filed its "Brief in Opposition to Petition for Post-Conviction Relief."  Both parties rely on these original filings for purposes of the current evidentiary hearings.  The record in this matter is voluminous.  The trial and sentencing proceedings occurred over the course of January through May, 2002.  The Court is in possession of and has reviewed and considered the entire record.  Notably, with respect to the pending matter, the Court received an Expert Consultation Report from Dr. Claus P. Speth, dated March 24, 2014 and Supplemental Report of January 15,

2016, unsigned.  In addition, the Court has received
and reviewed the transcripts of the PCR motion
testimony.  Lastly, the Defense then filed their
supplemental brief in support of petition for Post-
Conviction Relief on Tuesday, May 17, 2016.  The State
filed their supplemental brief objecting to
Defendant's motion for Post-Conviction Relief on
Monday, May 16, 2016.  The opinion which follows
details those portions of the record relevant to
resolving the issues presented in Defendant's pending
petition for PCR. <u>Based upon the court's consideration
of the trial record in this matter, the written
submissions of the parties, the arguments of counsel,
and the testimony placed on the record</u>, this Court
makes the following findings of fact and conclusions
of law.

ECF No. 1-2 at 8-9 (emphasis supplied); <u>see also</u> <u>id.</u> at 33 ("the

Court finds that following <u>a thorough reading</u> of the Defense's

supplemental brief, the Defense raised a number of additional

eleventh hour issues") (emphasis supplied).

      Further, as is clear from the quoted passages of the

judge's opinion above, his credibility findings were supported

by a reasoned analysis of counsel's testimony, including

counsel's stated reasons for his decisions throughout Messino's

criminal proceedings.  The Appellate Division affirmed the PCR

court's holding, including the credibility determinations,

"substantially for the sound reasons expressed in [the PCR

judge's] post-hearing written decision."  <u>Messino</u>, 2019 WL

208098, at *6.

      This Court will not revisit or second-guess the PCR judge's

credibility determinations.  Messino has not established that

the PCR judge failed to consider the evidence before him or that he simply adopted bald, self-serving statements of counsel. Habeas relief on Ground Eight will be denied.

    IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). Here, reasonable jurists would not find the Court's habeas ruling debatable.  Accordingly, no certificate of appealability shall issue.

V. CONCLUSION

For the foregoing reasons, Messino's petition will be denied with prejudice.  No certificate of appealability shall issue.  An appropriate order follows.

Dated: <u>April 17, 2023</u>        <u>s/ Noel L. Hillman</u>
At Camden, New Jersey      NOEL L. HILLMAN, U.S.D.J.